[L.A. No. 31388. Mar. 29, 1984.]

MICHAEL FINN, a Minor, etc., Plaintiff and Appellant, v.
G. D. SEARLE & COMPANY et al., Defendants and Respondents.

COUNSEL

Heily, Blase, Ellison & Wellcome, Heily, Blase & Ellison, David R. Ellison and Richard C. Gilman for Plaintiff and Appellant.

Leonard Sacks, Harvey R. Levine, Edward I. Pollock, Robert E. Cartwright, William M. Shernoff, Stephen I. Zetterberg, Sanford M. Gage, Arne Werchick, Ian Herzog, Glen T. Bashore, Wylie Aitken and Victoria J. De Goff as Amici Curiae on behalf of Plaintiff and Appellant.

McCutchen, Black, Verleger & Shea, Winchester Cooley III, Benton, Orr, Duval & Buckingham and Edwin Duval for Defendants and Respondents.

OPINION

**RICHARDSON, J.***—Plaintiff Michael Finn, a minor, appeals from a judgment for defendants in a civil action for personal injury. The claimed prejudicial error arises from the trial court's modification of certain jury instructions offered by plaintiff. Although we granted hearing in this case to consider the application of strict liability principles to injurious side effects allegedly produced by prescription drugs, our review of the record has convinced us that in light of the basis upon which plaintiff tried his case, this broader issue is not properly before us. Rather, we shall conclude that plaintiff has not demonstrated that it is reasonably probable that the trial court's modifications of his proposed instructions affected the judgment. Accordingly, we will affirm the judgment.

Shortly after his birth on June 6, 1969, plaintiff developed serious diarrhea and a diaper rash. When the rash spread, his pediatrician referred him to a dermatologist, Dr. Romaine, who diagnosed plaintiff's condition as acrodermatitis enteropathica (AE). AE has been described as commencing "as a skin eruption on an extremity or around one of the orifices of the body, followed by loss of hair, diarrhea, and other gastrointestinal disturbances; it is intermittently progressive and frequently ends fatally." (Stedman's Medical Dict. (4th unabridged ed. 1976).)

Dr. Romaine prescribed high doses of a drug, Diodoquin, which had been approved by the United States Food and Drug Administration and manufactured by defendant G. D. Searle & Company (Searle). This drug is a mem-

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

ber of a pharmacological group known as hydroxyquinolines. When plaintiff's illness was first diagnosed, the use of these drugs constituted the only known treatment for AE and, of the group, Diodoquin was the most commonly used.

After moving with his parents to California in 1970, plaintiff became the patient of defendant Dr. McGillis, a dermatologist, who again prescribed massive dosages of Diodoquin for the treatment of plaintiff's condition. Plaintiff's health improved dramatically with use of the drug, but periodic attempts to reduce the dosage resulted in reappearance of his AE symptoms.

In September 1971, plaintiff's mother noticed for the first time that plaintiff seemed to have difficulty with his vision. On October 22, he was examined by Dr. Lambert, an ophthalmologist, who diagnosed his condition as possible optic nerve atrophy. Upon learning that plaintiff had been taking large quantities of Diodoquin for an extended period, Dr. Lambert called Searle's headquarters to inquire as to the effects of the drug. After investigation, a physician employed by Searle informed Lambert that there had been a report of possible relationships between optic nerve atrophy and the prolonged use of large quantities of Diodoquin in children with AE. This information of a possible link was given by Dr. Lambert to Dr. McGillis who in turn advised plaintiff's mother to discontinue plaintiff's use of the drug. She did so, but when plaintiff's symptoms promptly reappeared, she again administered Diodoquin, ultimately resuming the higher dosage when a lower amount proved less effective in curbing the AE symptoms.

In December 1971, plaintiff was examined by various physicians on the staff of the University of California at Los Angeles Medical Center. Dr. Hepler, a neuro-ophthalmologist, finding severe visual problems, suspected that Diodoquin was the cause and advised plaintiff's mother to discontinue its use. Following examination, a gastroenterologist who saw plaintiff on December 28 concluded that plaintiff was actually suffering from irritable colon syndrome rather than AE and prescribed a different drug. Plaintiff's rash and diarrhea thereupon subsided, and there was some temporary improvement in his vision. However, he now suffers permanent and almost total blindness.

In 1973, plaintiff's mother acting as his guardian ad litem filed suit against Searle and Dr. McGillis, alleging that plaintiff's blindness was caused by Diodoquin. The complaint contained three causes of action. The first alleged that the Diodoquin was defective because Searle failed "to give adequate warning" of the risks of optic nerve atrophy; the second asserted that Searle negligently developed, tested, manufactured and distributed the drug; and the third charged that Dr. McGillis negligently examined, diagnosed and

treated plaintiff, and negligently prescribed Diodoquin in excessive amounts and for prolonged periods.

At trial, plaintiff presented a variety of evidence to support his contention that Searle had notice of a possible link between Diodoquin and optic atrophy which required a warning at the time plaintiff took the drug from 1969 through the end of 1971. First, plaintiff presented evidence that in 1966, two physicians, Drs. Etheridge and Stewart, published an article in the British medical journal *Lancet* reporting the development of optic atrophy in a child suffering from AE who had undergone prolonged high-dosage Diodoquin treatment. Plaintiff also presented a published report in 1968 which linked Vioform, a different drug which was a member of the same chemical family (hydroxyquinolines) as Diodoquin, with the development of optic atrophy in a patient with AE. Finally, in April 1971, another physician reported that Vioform was implicated in the development of a disease called subacute myelo-optic neuropathy (SMON) and in a few cases patients had developed optic neuritis or atrophy. Plaintiff asserted that the chemical similarities between Diodoquin and Vioform were so significant that the Vioform reports in conjunction with the 1966 study provided a basis upon which Searle was required to warn about possible optic atrophy and the use of Diodoquin.

In response, Searle's medical director stated that the 1966 report had been considered, but that because it was unclear whether the patient's eye problems had been caused by the drug or the disease, no labeling change was necessary. This conclusion was reiterated by three experts presented by Searle, including the physician who had served as director of the Federal Food and Drug Administration's Division of Medical Epidemiology in the mid-1960's, who stated that the report did not establish a causal link between the drug and the effect. As to the Vioform reports, Searle's experts testified that (1) the 1968 report failed to demonstrate that the Vioform rather than the AE had affected the optic system, (2) it was probable that SMON was caused by a viral agent or a pollutant and not Vioform, and (3) in any event, because of the chemical differences between Vioform and Diodoquin, the reports of possible side effects associated with the use of Vioform provided no basis for a determination that there was a need to warn about possible side effects from the therapeutic use of Diodoquin. In this connection, the experts noted that Diodoquin had never been linked to the development of SMON.

On the basis of the foregoing evidence, Searle contended that at the time that plaintiff was using the drug there was no basis upon which it could have been required to issue a warning. A warning was later affixed to Diodoquin which recited that "prolonged high-dosage therapy with hydroxyqui-

nolines'' should be avoided because optic difficulties had been reported in conjunction with such therapy. Searle explained that this language was included based on consideration of the 1966 report, the SMON report, which was then being reviewed by the FDA, *and* after it had learned of plaintiff's case and of a similar case which was reported two months later.

Finally, in response to plaintiff's evidence in support of his contention that his condition was negligently diagnosed and that his blindness was caused solely by the Diodoquin, Searle offered testimony supporting the diagnosis and in addition demonstrated that a zinc deficiency has since been identified as a cause of AE. Searle introduced evidence to establish that such a deficiency alone may have caused plaintiff's optic nerve atrophy. In summary, every issue, from the question of whether plaintiff had initially been misdiagnosed, through the possible causes of his blindness, and the propriety of issuing a warning based on the information available at the time, was contested at trial.

The trial court altered two jury instructions proposed by plaintiff which related to the nature and extent of a manufacturer's "duty to warn." One instruction read: "The manufacturer of a prescription drug is strictly liable to a plaintiff if it fails to warn the medical profession within a reasonable time after it knew or should have known that possible harmful side effects could be produced in persons such as plaintiff by long continued use of the drug known as Diodoquin."

The trial court redrafted this instruction, which as given to the jury then read: "The manufacturer of a prescription drug is liable to a plaintiff if it fails to warn the medical profession within a reasonable time after it knew or should have known that harmful side effects could be produced in users of its drug." Plaintiff's counsel withdrew any objection to the deletion of the adverb "strictly" and as the dissent concedes, the word "strictly" in the context of this instruction added nothing of substance. (Dis. opn., *post,* at p. 711.) As to deletion of the modifier "possible" before "harmful side effects," counsel responded, "I don't object too much." His principal complaint, referable to the instruction, was the substitution of the final phrase regarding users of the drug.

In amplification of the foregoing instruction relative to a manufacturer's general duty, plaintiff further requested a second instruction: "The manufacturer of a prescription drug is under a duty to warn the medical profession of potential dangers from use of its drug, even though the percentage of users who may be injured is not large."

After modification of the instruction by the trial judge, the jury was told: "The manufacturer of a drug is under a duty to exercise reasonable care to

warn the medical profession of potential dangers reasonably foreseeable from use of its drug, even though the percentage of users who may be injured is not large. The duty of the drug manufacturer is to warn the medical profession and there is no duty by the drug manufacturer to insure that the warning reaches the patient for whom the drug is prescribed." This instruction, and the court's modifications thereof, form the focus for plaintiff's contentions.

■■■ Following a three-month trial, the jury returned verdicts favoring both defendants. On appeal, plaintiff asserts multiple errors. Specifically, plaintiff contends that the trial court erred in (1) modifying the foregoing instructions by improperly injecting negligence concepts into the jury's consideration, thereby effectively clouding and confusing his strict liability claim, (2) excluding from evidence a Searle warning label referring to optic nerve atrophy, (3) excluding testimony of Dr. McGillis regarding the sufficiency of the Searle warning, and (4) instructing on the physician's duty of care as applied to defendant McGillis.

## I. "STRICT LIABILITY"

The sole basis on which plaintiff sought to impose "strict liability" upon Searle was its asserted failure to warn "of a severe side effect" which it knew or should have known could result from use of its drug. Plaintiff argues that by modifying his proposed instructions the trial court erroneously introduced negligence principles into the case thereby impairing his strict liability claim. However, our review of the challenged instructions is limited to consideration of the extent to which they departed from the theory actually presented by plaintiff at trial. We will conclude that despite plaintiff's expanded claims on appeal which encompass broader principles and applications of strict liability, plaintiff in fact proceeded at trial on a much narrower path. Under the theory on which the case was tried, no prejudicial error occurred. Contrary to the rationale of the dissenting opinion, we do not consider the applicability of strict liability in this case based on any claims other than a failure to warn of known or knowable side effects.

Plaintiff here was only asserting Searle's "delinquency" in failing to notify of known or knowable side effects. The dissenter's assertion that the trial court's modification "withdrew plaintiff's strict liability claim from the jury's consideration," and that "[t]his modification was critical to plaintiff's ability to prove his case against Searle" (dis. opn., *post*, p. 711) does not survive scrutiny. These assertions are founded upon the proposition that "a significant difference exists between strict liability and negligence claims based on a failure to warn" (*ibid.*). The authorities cited for that proposition are cases in which the question was whether liability could be imposed for

failure of the product to contain a warning of defects discovered, and reasonably discoverable, only *after* the product has caused injury. Obviously, under such a "hindsight" theory there exists a substantial, and critical, distinction between a negligence standard and strict liability.

The decisions on the point in other states have developed two lines of cases: one imposes strict liability for a failure to warn regardless of defendant's knowledge or ability to know of the side-effect-causing injury (see cases cited in *Woodill* v. *Parke Davis & Co.* (1980) 79 Ill.2d 26 [402 N.E.2d 194, 197]), and one focuses first on the manufacturer's actual or constructive knowledge. (See, e.g., *Tomer (Estate)* v. *America Home Prod. Corp.* (1976) 170 Conn. 681 [368 A.2d 35, 38]; *Leibowitz* v. *Ortho Pharmaceutical Corp.* (1973) 224 Pa.Super. 418 [307 A.2d 449, 457-458].) Here, we need not favor one position over the other because both plaintiff's theory and proposed instructions were based on the premise that Searle's duty to warn extended only to effects which were or should have been known at the time plaintiff took Diodoquin. Plaintiff himself offered the instruction limiting liability to such dangers.

"Failure-to-warn" cases involving claims that the manufacturer knew or should have known of the asserted danger and accordingly should have supplied a warning have been subject in California to a distinct form of analysis in the strict liability arena. The unique nature of the "defect" within this context was recently well described as follows: "[T]he jury cannot compare the product with other units off the same assembly line, nor can they at least weigh the reasonableness of the design against alternative designs presented by the plaintiff [citation]. Instead, they must decide whether a product flawlessly designed and produced may nevertheless possess such risks to the user without a suitable warning that it becomes 'defective' simply by the absence of a warning." (*Cavers* v. *Cushman Motor Sales, Inc.* (1979) 95 Cal.App.3d 338, 347 [157 Cal.Rptr. 142].)

■ The requisite warning may be of two kinds, each of which may have different implications. (See Prosser, Law of Torts (4th ed. 1971) § 99 at p. 659; contrast dis. opn. at p. 723 lumping all warnings together.) First, the manufacturer may be required adequately to instruct the consumer as to how the product should be used. For example, in *Midgley* v. *S.S. Kresge Co.* (1976) 55 Cal.App.3d 67 [127 Cal.Rptr. 217], strict liability was imposed when the manufacturer failed to advise users on the proper use and assembly of a telescope, thereby causing serious eye injury to the plaintiff. A second distinctive form of warning is that which informs a consumer (or, in the case of prescription drugs, the physician) of potential risks or side effects which may follow the foreseeable use of the product. (See generally *Borel* v. *Fibreboard Paper Products Corporation* (5th Cir. 1973) 493 F.2d

1076, 1088, 1089; Twerski et al. *The Use and Abuse of Warnings in Products Liability—Design Defect Litigation Comes of Age* (1976) 61 Cornell L.Rev. 495, 520-521.) Within the prescription drug context, the giving of this second form of warning may cause a physician-user to refuse to prescribe the drug. The particular risk described in the warning may well persuade the physician and patient in determining the treatment of choice. The distinct functions performed by the two kinds of warnings were described succinctly by one commentator: "In some circumstances a warning or directions would have reduced the risk. In other circumstances the warning would simply have afforded the consumer an opportunity to make an informed choice." (McClellan, *Strict Liability for Drug Induced Injuries: An Excursion Through the Maze of Products Liability, Negligence and Absolute Liability* (1978) 25 Wayne L.Rev. 1, 32.)

Some California courts have held that where imposition of liability is contingent upon the finding of dangers which were or should have been known, "concepts from negligence law have been amalgamated into the doctrine of strict liability . . . ." (*Carmichael* v. *Reitz* (1971) 17 Cal.App.3d 958, 988 [95 Cal.Rptr. 381]; see *Ortho Pharmaceutical Corp.* v. *Chapman* (1979) 180 Ind.App. 33 [388 N.E.2d 541, 550].) Another division of the Court of Appeal concluded that rules conditioning liability upon knowledge of danger "are rules fixing duties of care. Since violation of a duty of care has always been an element in the definition of negligence, the rules expressed in comment j of the new Restatement, although stated as an adjunct to 'strict' liability are merely well settled rules already a part of the law of negligence." (*Oakes* v. *E. I. Du Pont de Nemours & Co., Inc.* (1969) 272 Cal.App.2d 645, 650, fn. 4 [77 Cal.Rptr. 709]; see *Christofferson* v. *Kaiser Foundation Hospitals* (1971) 15 Cal.App.3d 75, 79-80 [92 Cal.Rptr. 825, 53 A.L.R.3d 292].) However, following our decision in *Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1], in yet another opinion the Court of Appeal extended the balancing approach formulated in that decision to a case involving an asserted failure to warn. (*Cavers* v. *Cushman Motor Sales, supra,* 95 Cal.App.3d at pp. 347-348.)

 Arguably, the difference between negligence and strict liability standards in this situation is the focus: in the first, the jury must determine the reasonableness of the manufacturer's conduct; in the second, the determination is whether the product has been rendered defective because, applying an objective standard, and weighing the relevant costs and benefits, a warning was required. In light of the opinion in *Barker,* a balancing test as enunciated in *Cavers* may therefore be appropriate. However, as we discuss, plaintiff here relied on cases emphasizing the overlap of negligence and strict liability principles in this context and we need not decide whether

and how the *Barker* formulation would apply. He did not at any point urge a standard which called for a jury decision as to whether the benefit of a particular warning would outweigh its costs under *Barker*.

Furthermore, the critical instruction as it was originally proposed by plaintiff did not in fact furnish *any* standard for the jury to apply with respect to the nature or degree of the potential danger which would give rise to an obligation to warn. Even after the trial court indicated its intent to modify the instruction by adding the words "reasonable care," it does not appear from the record that plaintiff offered any different standard to provide guidance. This lack would have invited the jury to find Searle liable for failure to warn of any "danger" without limitation. Assuming, for the purpose of argument, that on plaintiff's limited theory of liability there could be a practical difference between negligence and strict liability bearing on the manufacturer's duty to warn based on information it possessed or could have obtained, it seems obvious that liability ought not to be imposed for failure to warn based on every piece of information in a manufacturer's possession. (See *Cavers, supra,* 95 Cal.App.3d at pp. 348-349.)

The quality of evidence supporting a causal connection between product and injury may range from extremely vague to highly certain. Knowledge of a potential side effect which is based on a single isolated report of a possible link between a prescription drug and an injury may not require a warning. "If we overuse warnings, we invite mass consumer disregard and ultimate contempt for the warning process." (Twerski et al., *supra,* 61 Cornell L.Rev. at p. 521.) Moreover, both common sense and experience suggest that if every report of a possible risk, no matter how speculative, conjectural, or tentative, imposed an affirmative duty to give some warning, a manufacturer would be required to inundate physicians indiscriminately with notice of any and every hint of danger, thereby inevitably diluting the force of any specific warning given. (See Twerski, *From Risk-Utility to Consumer Expectations: Enhancing the Role of Judicial Screening in Product Liability Litigation* (1983) 11 Hofstra L.Rev. 861, 932-935; *Thompson* v. *County of Alameda* (1980) 27 Cal.3d 741, 755 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701].) The strength of the causal link thus is relevant both to the issue of whether a warning should be given at all, and, if one is required, what form it should take. The trial court was justified in modifying the instruction to take into account the dangers of overwarning and plaintiff failed to offer an alternative approach. ■ " 'In a civil case, each of the parties must propose complete and comprehensive instructions in accordance with his theory of the litigation; if the parties do not do so, the court has no duty to instruct on its own motion.' [Citations.]" (*Agarwal* v. *Johnson* (1979) 25 Cal.3d 932, 950-951 [160 Cal.Rptr. 141, 603 P.2d 58].) Neither a trial court nor a reviewing court in a civil action is obligated

to seek out theories plaintiff might have advanced, or to articulate for him that which he has left unspoken.

▇▇▇▇ The conclusion that the court's modification here did not significantly alter plaintiff's theory of liability is further buttressed by consideration of plaintiff's submissions to the court in support of his instruction. Plaintiff cited two *negligence* cases as authority for his proposed instruction: *Love* v. *Wolf* (1967) 249 Cal.App.2d 822, 833 [58 Cal.Rptr. 42] (*Love II*) and *Love* v. *Wolf* (1964) 226 Cal.App.2d 378 [38 Cal.Rptr. 183] (*Love I*). In both cases the courts stated that "in the case of a drug it has been held that there is *a duty to exercise reasonable care* to warn of potential dangers from use even though the percentage of users who will be injured is not large. [Citation.]" (*Love I,* at p. 395, italics added; *Love II,* at p. 833.) The trial court's alterations in fact conformed the instruction to the authorities presented by plaintiff which specifically referred to the *reasonableness* of the manufacturer's conduct.

Ultimately, it seems unlikely that the jury was misled in this case by the court's failure to instruct in terms other than reasonable care. As we have noted, the jury arguably should have been specifically instructed to consider whether after balancing the costs and benefits of such a warning, a warning based on information Searle had in hand would have been appropriate. (Cf. *Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d 413.) Even though plaintiff requested no such instruction, Searle in fact presented to the jury an argument couched in terms of a "balancing test." Defense counsel argued: "[W]hat it really comes down to is what are you trying to do? What is the logic of all of this? And it seems to me the logic is that you. warn, if you think that by doing that you are going to do some good, and you don't warn if you believe that in doing that, by warning you are going to cause harm."

One further basis for concluding that no prejudicial error occurred is that, even if the modification constituted error, and even if that error could have misled the jury, further significant questions exist whether on this record a jury was likely to find a causal relationship between lack of notice and plaintiff's injury. Assuming that plaintiff's condition was not misdiagnosed, as the jury apparently concluded by absolving Dr. McGillis of liability, this drug was the only known treatment for plaintiff's disease. The disease was frequently fatal if untreated. In fact, plaintiff's use of the drug was *resumed* even after plaintiff had knowledge of potential side effects to the degree known by Searle. It seems unlikely that the jury would have believed that plaintiff's physician would have (or should have) refrained from prescribing the drug, or that plaintiff would have refrained from taking it, on the basis of the rather insubstantial evidence then in Searle's possession regarding possible side effects.

In summary, we conclude that given plaintiff's theory at trial and the instructions which he requested, the trial court modifications provide no basis for a reversal. Plaintiff has failed to demonstrate that the jury was, or may have been, actually misled.

## II. Exclusion of the Package Insert Warning

The trial court admitted into evidence Searle's February 1972 label insert for Diodoquin containers which had been altered after Searle had reviewed plaintiff's case, a similar case in December 1971, and evidence regarding the development of a rare disease in Japan linking usage of a related drug and optic nerve atrophy. While Searle's previous label had not recited any optically related risks, the new label indicated under "Adverse Reactions" that "Optical neuritis, optic atrophy, and peripheral neuropathy have been reported following prolonged high-dosage therapy with hydroxyquinolines. Long-term use of the drug should be avoided."

■ Plaintiff claims that he was prejudiced by the trial court's refusal to permit introduction of a label inserted in the Diodoquin package by defendant in May 1972. This label included the above described language under the heading "Warning." Essentially the same language, under the heading "Warnings," was contained in later package inserts.

Plaintiff relies on *Ault* v. *International Harvester Co.* (1975) 13 Cal.3d 113 [117 Cal.Rptr. 812, 528 P.2d 1148, 74 A.L.R.3d 986], and *Burke* v. *Almaden Vineyards, Inc.* (1978) 86 Cal.App.3d 768 [150 Cal.Rptr. 419], as authority for the admission of the evidence of subsequent remedial measures, claiming that the change in the warnings was relevant on the issue of Searle's knowledge and duty to warn.

Whether or not *Ault* applies, we find no reversible error occurred in the trial court's exclusion of the postaccident warning contained in the package. Such labelling information, at best, was cumulative. The jury had previously been advised that, following plaintiff's injury, warnings of effects similar to those claimed by plaintiff had been inserted by Searle in its Diodoquin containers.

## III. Other Contentions

■ Plaintiff urges error in the trial court's refusal to permit him to question Dr. McGillis about the adequacy of Searle's warning. However, because Dr. McGillis had not been qualified as an expert in drug epidemiology (Evid. Code, § 801), he was not qualified to render an expert opin-

ion regarding Searle's duty to warn. Moreover, three expert witnesses did testify for plaintiff on the point. Any error was harmless.

■ Further with reference to Dr. McGillis, plaintiff challenges the court's refusal to give the following instruction: "A physician has a duty to properly diagnose a patient's condition once he has undertaken the role of a treating physician. He must perform said diagnosis in accordance with the degree of learning and skill ordinarily possessed by physicians and surgeons of good standing practicing in the same or similar locality and under similar circumstances. [¶] By diagnosis is meant the discovery of the source of a patient's illness or the determination of the nature of his disease (or ailment) from a study of its symptoms."

Consistent with BAJI No. 6.00, sixth edition 1977, the jury was instructed that a physician has a general duty to exercise the care and skill ordinarily exercised by members of the profession. The jury was also told that a specialist is held to the standards of specialists in the same field and under similar circumstances. (BAJI No. 6.01 (6th ed. 1977).) Plaintiff argues that the court's refusal to give his proffered instruction improperly removed from the jury's consideration the issue of whether Dr. McGillis was negligent in making the original diagnosis. The instructions which were given, however, applied to all of the relevant functions of a physician. More importantly, as framed, plaintiff's proposed instruction arguably would have imposed *strict* liability on a physician for failure properly to diagnose a patient's condition. This is an overbroad and inaccurate description of a physician's duty, and as such was properly rejected. (Compare BAJI, *supra,* No. 6.02 [physician not negligent merely because he or she errs].) Even if the suggestion of "strict liability" presented in the first sentence of the proposed instruction was vitiated by the second sentence's reference to ordinary community standards of medical care, this issue was adequately covered by the instructions given and plaintiff suffered no prejudice.

■ Plaintiff also sought to introduce into evidence three articles from various medical journals. One, a report on iodism, had little relevance and was properly excluded. (Evid. Code, § 352.) The remaining articles, while relevant, were hearsay, and plaintiff has not asserted that they were offered to "prove facts of general notoriety and interest." (*Id.,* §§ 1200, 1341.) The court properly permitted plaintiff to read certain passages from the documents and to question witnesses concerning them without receiving the documents themselves into evidence. (*Id.,* §§ 721, 802; see *Luque* v. *McLean* (1972) 8 Cal.3d 136, 147-148 [104 Cal.Rptr. 443, 501 P.2d 1163]; *People* v. *Kozel* (1982) 133 Cal.App.3d 507, 535 [184 Cal.Rptr. 208]; see generally, 2 Jefferson, Cal. Evidence Benchbook (1982) § 29.8, p. 1034 et seq.) No error has been demonstrated.

The judgment is affirmed.

Mosk, J., Kaus, J., Broussard, J., Reynoso, J., and Grodin, J., concurred.

**BIRD, C. J.,** Dissenting.—May a drug manufacturer be held strictly liable for injuries resulting from the use of its product?

I.

Plaintiff, Michael Finn, was born on June 6, 1969. In early infancy, he began to have serious problems involving the digestive system. At 14 months old, Michael developed a skin rash which spread to all parts of his body. Simultaneously, he experienced severe diarrhea, loss of appetite and difficulty sleeping. His parents took him to a pediatrician, who referred Michael to a dermatologist.

The dermatologist concluded that Michael appeared to be suffering from a rare and potentially fatal skin disease, acrodermatitis enteropathica (AE).[1] He prescribed high doses of Diodoquin, a drug manufactured by defendant, G. D. Searle & Company (Searle). Diodoquin belongs to a group of drugs known as hydroxyquinolines. At the time of Michael's illness, these drugs constituted the only known treatment for AE. Diodoquin was the most common hydroxyquinoline prescribed for the disease.

The family later moved to California, where another dermatologist, Dr. McGillis, undertook Michael's care. Dr. McGillis agreed with the first diagnosis and continued Diodoquin therapy. Michael's condition improved dramatically with the continued use of the drug.

In September 1971, Michael's mother noticed that he was having difficulty seeing. On October 22nd, she took him to see an ophthalmologist, Dr. Lambert. Michael's condition was diagnosed as optic nerve atrophy. After learning that Michael had been taking large doses of Diodoquin for an extended period, Dr. Lambert called a doctor at Searle's headquarters to ask about the effects of the drug. On October 25th or 26th, Searle's personnel advised Dr. Lambert of an article which referred to a 1966 report by Drs. Etheridge and Stewart of the University of North Carolina. That report

---

[1]Stedman's Medical Dictionary (4th unabridged ed. 1976) defines acrodermatitis enteropathica as "a disease of young children (3 weeks to 18 months), commencing as a skin eruption on an extremity or around one of the orifices of the body, followed by loss of hair, diarrhea, and other gastrointestinal disturbances; it is intermittently progressive and frequently ends fatally."

discussed a possible link between optic nerve atrophy and long term, high dose use of Diodoquin to treat a young child with AE.

After Dr. Lambert informed Dr. McGillis of the possible link, Dr. McGillis called Mrs. Finn and advised her to discontinue the Diodoquin as soon as possible. She did so immediately, but Michael soon developed the same symptoms he had previously experienced. His health deteriorated rapidly and on November 18th, Michael was again given Diodoquin, but at a lower dosage. The dosage was increased to its higher former level on December 4, 1971.

In December, Michael was also taken to see various physicians at UCLA. Dr. Hepler, a neuro-ophthalmologist, examined Michael and informed his mother that her son was going blind. He felt that Diodoquin was the most likely cause of the blindness and advised her to discontinue its use.

The gastroenterologist who saw Michael on December 28th diagnosed his condition as irritable colon syndrome and prescribed SSKI, a drug used to treat this condition. Although Michael's diarrhea and rash subsided, his vision was not restored. Michael now suffers from permanent and almost total blindness.

In 1973, Michael's mother filed suit as guardian ad litem against Searle and Dr. McGillis, alleging that Michael's blindness was caused by Diodoquin. The first cause of action against Searle alleged that the drug was defective in that Searle had failed to warn that blindness was a possible side effect. The second cause of action claimed negligence in the testing, development, manufacture, and marketing of Diodoquin. As to Dr. McGillis, the Finns alleged that the doctor had negligently examined, diagnosed, and treated Michael and had negligently prescribed Diodoquin in excessive and prolonged dosages.

At trial, Michael attempted to prove that Searle had provided inadequate warnings regarding Diodoquin's side effects. In April 1971, while Michael was taking Diodoquin but before any problems in his vision were noticed, defendant Searle's package insert read: "No contraindications are known. [¶] Side effects are extremely rare and signs of toxicity almost completely lacking. A very few instances of iodism have been reported."[2] Searle's medical director, Dr. Irwin Winter, testified that he was aware of the 1966 Etheridge/Stewart report linking Diodoquin with optic nerve atrophy. In addition, he was aware of a separate report which associated optic nerve atrophy with another hydroxyquinoline, Vioform. Although he had paid

---

[2]Iodism is iodine poisoning. It is not involved in this case.

careful attention to these reports, he had concluded that they "did not support a judgment in favor of a change in [Searle's] literature." Millions of doses of Diodoquin had been distributed without reports of eye impairment, though the common use of the drug was at low dosages to treat amebic dysentery. Dr. Winter's conclusion regarding the impact of the Etheridge/Stewart report was supported by Dr. Donald Levitt. At the time of the report, Dr. Levitt was the director of the Food and Drug Administration's Division of Medical Epidemiology.

In February 1972, after Michael had been taken off Diodoquin, Searle changed its warning. This change was made in response to three events: Michael's case, another similar case reported in December 1971, and the development of a rare disease, SMON, in Japan. A medical study linked SMON with Vioform. Side effects of the disease included optic atrophy. Under "Adverse Reactions," the new label read: "Optic neuritis, optic atrophy and peripheral neuropathy have been reported following prolonged, high-dosage therapy with hydroxyquinolines. Long term use of the drug should be avoided." This label was introduced into evidence.

Michael sought to admit into evidence a May 1972 warning which contained similar language under a new heading, "Warnings."[3] However, the trial court denied this motion.

In its defense, Searle presented evidence on the adequacy of its warnings and the issue of causation. Its experts advanced the proposition that AE, not Diodoquin, had caused Michael's blindness. Subsequent to Michael's treatment with Diodoquin, medical researchers discovered that AE was caused by a zinc deficiency and could be cured by the administration of zinc. In support of Searle's causation theory, its experts referred to several studies which have linked optic atrophy with zinc deficiency.

Michael claimed, however, that he never had AE. He asserted that Dr. McGillis had negligently diagnosed his condition and that Diodoquin alone was responsible for his blindness. Dr. Fleisher, the gastroenterologist who diagnosed Michael's condition as irritable colon syndrome, stated that certain of Michael's symptoms were inconsistent with AE. This conclusion was supported by Dr. Samuel Weinberg, a pediatric dermatologist, and by Dr. Leon Kelly, a pediatrician.

Michael's witnesses testified that Diodoquin was the probable cause of his optic atrophy. They referred to the reports mentioned earlier as well as

---

[3]The language in the two warnings was virtually the same. The latter warning substituted the phrase "with a hydroxyquinoline" in place of "with hydroxyquinolines." In addition, under "Adverse Reactions," the May 1972 label stated: "Optic atrophy has been associated with long-term administration of large doses of a hydroxyquinoline."

other studies which linked Diodoquin and similar drugs (including Vioform) with optic atrophy.

For their part, Searle's experts strongly disputed any reliance on the studies pertaining to chemically similar drugs. They asserted that the structure and pharmacological effect of these drugs were so dissimilar to Diodoquin that experience with the related drugs was irrelevant.

The trial lasted approximately three months. At the close of testimony, Michael's attorney requested two instructions. The first of these read, "The manufacturer of a prescription drug is liable to a plaintiff if it fails to warn the medical profession within a reasonable time after it knew or should have known that possible harmful side effects could be produced in persons such as plaintiff by prolonged, high dosage use of the drug."[4]

The trial court modified the instruction in two respects. First, the court deleted the word "possible." Michael's attorney stated, "I don't object . . . too much." The court then inserted "users of its drug" in place of "persons such as plaintiff by prolonged, high dosage use of the drug." Michael's attorney argued that "prolonged, high dosage use" was central to his case, since the evidence revealed no link between blindness and low levels of Diodoquin.

Michael's attorney also requested the trial court to instruct the jury that, "The manufacturer of a drug is under a duty to warn the medical profession of potential dangers from use of its drug, even though the percentage of users who may be injured is not large." Over plaintiff's objection, the court modified this instruction to read, "The manufacturer of a drug is under a duty to exercise reasonable care to warn the medical profession of potential dangers reasonably foreseeable from use of its drug, even though the percentage of users who may be injured is not large. The duty of the drug manufacturer is to warn the medical profession. [¶] There is no duty by the drug manufacturer to insure that the warning reaches the patient for whom the drug is prescribed."[5]

---

[4]According to plaintiff, the first instruction he requested read: "The manufacturer of a prescription drug is *strictly* liable to a plaintiff if it fails to warn the medical profession within a reasonable time after it knew or should have known that . . . harmful side effects could be produced in persons such as plaintiff by *long continued* use of the drug *known as Diodoquin.*" (Italics and ellipsis added to indicate differences.) This statement conflicts with the argument of counsel in the trial court. According to Searle, the instruction as first drafted did include "strictly" and the phrase "known as Diodoquin." Searle claims that plaintiff withdrew the instruction and modified it before resubmitting the instruction in the form quoted in the text. Plaintiff has not responded directly to that contention.

[5]The record contains little discussion between the parties and the trial court concerning the instructions that were given to the jury. Apparently, the instructions were debated at great length off the record in the judge's chambers. However, before instructing the jury, the trial court was careful to note for the record that all modifications of requested instructions "were made over the objection of the propounding party."

After receiving instructions, the jury returned verdicts that same day in favor of both defendants.

On appeal, Michael contends that the modification of these two instructions by the trial court improperly withdrew from the jury any consideration of the application of strict liability to Searle. He also contends that the court erred in refusing to allow the introduction of the May 1972 warning for Diodoquin. In addition, Michael claims that the court erroneously excluded testimony from Dr. McGillis regarding the sufficiency of Searle's warning and improperly refused to admit various medical journals. Plaintiff also contends that the trial court erred in its instructions on a physician's duty of care as it applied to Dr. McGillis.

## II.

The initial question raised by this case concerns the trial court's modification of plaintiff's requested jury instructions. Plaintiff contends that the modification was erroneous since it withdrew an appropriate theory of strict liability from the jury's consideration.

Generally, a party to a lawsuit is entitled to have the jury instructed on any theory of law that is supported by the pleadings and evidence of the case. (*Phillips* v. *G. L. Truman Excavation Co.* (1961) 55 Cal.2d 801, 806 [13 Cal.Rptr. 401, 362 P.2d 33]; see generally, 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 192, p. 3012.) Here, in the complaint and at trial, plaintiff advanced the theory that Diodoquin was defective because Searle had failed to warn of harmful side effects about which it knew or should have known. Therefore, Searle was strictly liable for the loss of vision resulting from plaintiff's use of the drug.

Plaintiff's strict liability theory accurately reflected the state of the case law at the time of his trial. In *Toole* v. *Richardson-Merrell Inc.* (1967) 251 Cal.App.2d 689 [60 Cal.Rptr. 398, 29 A.L.R.3d 988], the plaintiff developed cataracts in his eyes as a result of taking the drug triparanol. Plaintiff's complaint against the drug manufacturer alleged causes of action based on negligence and strict liability. The jury returned a verdict in favor of the plaintiff.

On appeal, the manufacturer contended, inter alia, that it was error for the trial court to instruct on strict liability since that doctrine was not applicable to the sale of prescription drugs. The Court of Appeal rejected this argument, holding that "[w]hether or not the vendor of a prescription drug is to be exempt from strict liability depends upon the facts surrounding the manufacture and sale of the product . . . . [W]here the facts disclose that

the drug . . . has been placed upon the market and sold without adequate and proper warning, strict liability for resulting injury may be found." (*Id.*, at pp. 710-711.)

In *Toole,* the possibility of eye injury was known to the manufacturer before the drug was marketed and taken by the plaintiff. Yet, no warning of that danger was provided. Thus, the Court of Appeal concluded that strict liability instructions were "justified on the ground that the product was marketed without proper warning of its known dangerous effect." (*Id.*, at p. 711.)

*Toole*'s holding was reaffirmed in *Carmichael* v. *Reitz* (1971) 17 Cal.App.3d 958, 988 [95 Cal.Rptr. 381] ["*Toole* . . . correctly states the law . . . ."]. (See also *Grinnell* v. *Charles Pfizer & Co.* (1969) 274 Cal.App.2d 424, 435-436, fn. 7 [79 Cal.Rptr. 369]; accord *Singer* v. *Sterling Drug, Inc.* (7th Cir. 1972) 461 F.2d 288, 292, cert. den. 409 U.S. 878 [34 L.Ed.2d 132, 93 S.Ct. 131]; *Davis* v. *Wyeth Laboratories, Inc.* (9th Cir. 1968) 399 F.2d 121, 130.)

The basis of the rule of strict liability articulated in *Toole* and *Carmichael* was section 402A of the Restatement Second of Torts. This section generally imposes strict liability on the seller of "any" defective product that causes physical injury to the consumer. (Rest.2d Torts, § 402A.) Comment k creates an exception to this broad rule for unavoidably unsafe products which are useful to society. These products are not considered defective for the purpose of applying strict liability if they have been "properly prepared, and accompanied by *proper directions and warning* . . . ." (Rest.2d Torts, *supra*, § 402A, com. k, pp. 353-354, italics added.) From the limited nature of the exception drawn in comment k, *Toole* and *Carmichael* reasoned that where a drug manufacturer has not accompanied its product with adequate warnings of a known danger, strict liability is applicable. (*Carmichael* v. *Reitz, supra,* 17 Cal.App.3d at pp. 986-989; *Toole* v. *Richardson-Merrell Inc., supra,* 251 Cal.App.2d at pp. 708-711.)[6]

Thus, under the then controlling case law, plaintiff was entitled to have the jury instructed on his strict liability claim.[7] Plaintiff submitted instructions to the trial court that logically followed from the rule articulated in

---

[6]In dictum, *Oakes* v. *E. I. Du Pont de Nemours & Co., Inc.* (1969) 272 Cal.App.2d 645 [77 Cal.Rptr. 709] suggests that the comments' rule imposing upon the seller a duty to warn of dangers is merely a reiteration of the law of negligence. (*Id.*, at p. 650, fn. 4.) However, that opinion overlooks the fact that as used in comment k, an adequate warning is a prerequisite for rendering a prescription drug "not defective" under the doctrine of strict liability.

[7]It is not disputed that there was sufficient evidence to provide a factual basis for the requested instructions.

*Toole.* His first instruction would have informed the jury that if Searle knew or should have known of the drug's harmful side effects and failed to warn the medical profession of these dangers, it was strictly liable for plaintiff's injuries.[8] This instruction would not have premised liability on whether or not Searle exercised "reasonable care" in marketing Diodoquin without a warning. Plaintiff's second instruction would have added that even when the percentage of consumers who may be injured by a drug is small, the manufacturer is not relieved of its obligation to warn of dangers.[9]

The trial court refused to give plaintiff's instructions without modification. The revision of the second instruction explicitly limited Searle's duty to warn of dangers to the exercise of "reasonable care." By conforming the instructions to a pure negligence theory, the trial court withdrew plaintiff's strict liability claim from the jury's consideration.

This modification was critical to plaintiff's ability to prove his case against Searle. A significant difference exists between strict liability and negligence claims based on a failure to warn. As the Oregon Supreme Court has explained, "In a strict liability case we are talking about the condition (dangerousness) of an article which is sold without any warning, while in negligence we are talking about the reasonableness of the manufacturer's actions in selling the article without a warning. The article can have a degree of dangerousness because of a lack of warning which the law of strict liability will not tolerate even though the actions of the seller were entirely reasonable in selling the article without a warning considering what he knew or should have known at the time he sold it." (*Phillips* v. *Kimwood Machine Co.* (1974) 269 Ore. 485 [525 P.2d 1033, 1039]; accord *Freund* v. *Cellofilm Properties, Inc.* (1981) 87 N.J. 229 [432 A.2d 925, 929] and cases cited therein; *Hamilton* v. *Hardy* (1976) 37 Colo.App. 375 [549 P.2d 1099, 1106-1107].)

Here, the trial court's editing of plaintiff's instructions obliterated the distinction between strict liability and negligence, and improperly focused the jury's attention on the conduct of the manufacturer. As a result, plaintiff

---

[8]This is true regardless of whether the word "strictly" was included in the instruction as proposed. (See *ante,* p. 708, fn. 4.) That word by itself had no importance. It was the instruction as a whole that explained plaintiff's theory of strict liability.

[9]The fact that the instructions contained language limiting Searle's duty to warn to dangers of which it "knew or should have known" did not mean that plaintiff was merely advancing a negligence theory. Under the cases, "concepts from negligence law [were] amalgamated into the doctrine of strict liability . . . ." (*Carmichael* v. *Reitz, supra,* 17 Cal.App.3d at p. 988.) However, it was not intended that the jury consider those concepts as a basis for determining the reasonableness of the drug manufacturer's *conduct.* Rather, the jury was to rely on concepts of reasonableness in evaluating the defectiveness of the *drug.*

faced a greater burden of proof than required by the rule of strict liability as articulated in *Toole*.

This court has stated that "one of the principal purposes behind the strict product liability doctrine is to relieve an injured plaintiff of many of the onerous evidentiary burdens inherent in a negligence cause of action." (*Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413, 431 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1].) Yet, in order to prevail, plaintiff not only had to prove that Diodoquin was defective, but also that Searle had not acted as a reasonably prudent manufacturer.

The instructional error in the present case is similar to that in *Hutchinson* v. *Revlon Corp.* (1967) 256 Cal.App.2d 517 [65 Cal.Rptr. 81]. In that case, the plaintiff was injured by her use of a deodorant manufactured by the defendant. At trial, she advanced the theory that the defendant was strictly liable for the defective condition of its product. The jury returned a verdict against the plaintiff.

On appeal, the Court of Appeal found that the trial judge had erred in instructing the jury. Justice Kaus, writing for the court, explained that the plaintiff "was entitled to have the jury instructed on a theory of recovery which did not require proof of [defendant's] negligence." (*Id.*, at p. 522.) The trial court gave two such instructions "but nevertheless by a series of quirks the jury was, in effect, not instructed on any theory except negligence." (*Ibid.*)

The "quirks" to which Justice Kaus referred were twofold. First, the trial court's instruction on implied warranty of fitness was neutralized by the giving of another conflicting instruction. Second, the instruction explaining strict liability for defective products was hidden from the jury because it was given as part of the instructions on negligence. "[The] lay-jury undoubtedly felt that it was simply being instructed . . . that there was a right—duty relationship between manufacturer and consumer and that the duty involved was merely one of reasonable care." (*Id.*, at p. 525.) Since the trial court effectively failed to "instruct on any theory that did not require proof of negligence," the Court of Appeal reversed the judgment. (*Ibid.*)

Although the precise manner in which the trial court erred in *Hutchinson* differed from the present case, the end result was identical. The jury was only instructed on negligence, even though plaintiff was entitled to and requested strict liability instructions.

As in *Hutchinson*, this error was not harmless. "[I]f it appears that error in giving an improper instruction was likely to mislead the jury and thus to

become a factor in its verdict, it is prejudicial and ground for reversal." (*Henderson* v. *Harnischfeger Corp.* (1974) 12 Cal.3d 663, 670 [117 Cal.Rptr. 1, 527 P.2d 353].) Certainly, there was sufficient evidence for the jury to find for plaintiff on his theory of strict liability. Plaintiff's witnesses testified that Diodoquin was the probable cause of his injury. This testimony was supported by the clinical data linking Diodoquin and similar drugs to blindness and by Searle's change in the warning label. Some of these studies were available to Searle prior to the date Diodoquin was prescribed for plaintiff. While the jury was not required to accept plaintiff's version of the facts, neither was it required to believe Searle's defense.

The jury was not given special verdict forms. As a result, it is impossible for this court to determine that the erroneous negligence instruction was not "a factor" in the jury's verdict. Plaintiff was deprived of the opportunity to present an applicable theory of recovery to the jury. There is a reasonable possibility that the jury, if properly instructed, could have decided in favor of plaintiff. Therefore, the judgment should be reversed.

## III.

I would like to address several other questions concerning the application of strict liability to injuries caused by prescription drugs. Plaintiff apparently felt constrained by the state of the case law. As a result, he advanced only a strict liability claim based on Searle's failure to warn. Whether or not plaintiff could have argued that Searle was strictly liable because Diodoquin itself was defective presents an important question of first impression in this jurisdiction.

The doctrine of strict liability was first urged as the basis of recovery in defective products cases by former Justice Traynor in his concurring opinion in *Escola* v. *Coca Cola Bottling Co.* (1944) 24 Cal.2d 453, 461 [150 P.2d 436]. "In my opinion it should now be recognized that a manufacturer incurs an absolute liability when an article that he has placed on the market, knowing that it is to be used without inspection, proves to have a defect that causes injury to human beings." (*Ibid.*)

In Justice Traynor's view, considerations of public policy demanded this development in the law. "Even if there [were] no negligence . . . public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market. It is evident that the manufacturer can anticipate some hazards and guard against the recurrence of others, as the public cannot. Those who suffer injury from defective products are unprepared to meet its consequences. The cost of an injury and the loss of time or health may be an

overwhelming misfortune to the person injured, and a needless one, for the risk of injury can be insured by the manufacturer and distributed among the public as a cost of doing business. It is to the public interest to discourage the marketing of products having defects that are a menace to the public. If such products nevertheless find their way into the market it is to the public interest to place the responsibility for whatever injury they may cause upon the manufacturer, who, even if he is not negligent in the manufacture of the product, is responsible for its reaching the market. However intermittently such injuries may occur and however haphazardly they may strike, the risk of their occurrence is a constant risk and a general one. Against such a risk there should be general and constant protection and the manufacturer is best situated to afford such protection." (*Id.,* at p. 462.)

In *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049], this court unanimously adopted Justice Traynor's position. *Greenman* applied strict liability to the manufacturer of a defective combination power tool which had caused serious injury to the plaintiff. In so doing, this court reasoned that the purpose of strict liability "is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." (*Id.,* at p. 63.)

*Greenman* did not limit the application of the new rule of strict liability in tort to any subclass of products. The court noted that, although "[r]ecognized first in the case of unwholesome food products," such liability had already been extended to a "variety of other products," including vaccines, that "create[d] as great or greater hazards if defective." (*Id.,* at p. 62.) Accordingly, the rule stated was broad in its reach. "A manufacturer is strictly liable in tort when an article he places on the market . . . proves to have a defect that causes injury to a human being." (*Ibid.*)

*Greenman,* together with *Henningsen* v. *Bloomfield Motors, Inc.* (1960) 32 N.J. 358 [161 A.2d 69, 75 A.L.R.2d 1] initiated a national movement toward the application of strict liability in defective products cases. The Restatement Second of Torts encouraged this trend by adding section 402A. (See generally, *Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 130-131 [104 Cal.Rptr. 433, 501 P.2d 1153].) "One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property. . . ." (Rest.2d Torts, *supra,* § 402A.)

In *Cronin* v. *J.B.E. Olson Corp., supra,* 8 Cal.3d at pages 132-134, this court rejected the "unreasonably dangerous" gloss added by section 402A.

Although recognizing that the Restatement viewed the requirement as necessary to prevent a manufacturer from becoming an insurer against all injuries (see Rest.2d Torts, § 402A, com. i), *Cronin* noted that in practice its effect had been to "burden the injured plaintiff with proof of an element which rings of negligence. As a result, if, in the view of the trier of fact, the 'ordinary consumer' would have expected the defective condition of a product, the seller is not strictly liable regardless of the expectations of the injured plaintiff." (*Cronin, supra,* 8 Cal.3d at pp. 132-133.) Finding such an outcome at odds with the purposes of the doctrine of strict liability, this court held that a plaintiff need only prove that a defect in a product was the proximate cause of his injuries. (*Id.,* at pp. 133-134.)

In rejecting the "unreasonably dangerous" gloss added by section 402A, *Cronin* reaffirmed the importance and breadth of the strict liability doctrine announced in *Greenman*. (*Id.,* at pp. 132-135; see also *Luque* v. *McLean* (1972) 8 Cal.3d 136, 141-146 [104 Cal.Rptr. 443, 501 P.2d 1163].) Other opinions of this court have similarly emphasized the reach of the doctrine. For example, strict liability has been applied to retailers (*Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256, 263 [37 Cal.Rptr. 896, 391 P.2d 168]) and to bailors and lessors (*Price* v. *Shell Oil Co.* (1970) 2 Cal.3d 245, 248 [85 Cal.Rptr. 178, 466 P.2d 722]), as well as to manufacturers (*Greenman*). (See also *Barth* v. *B.F. Goodrich Tire Co.* (1968) 265 Cal.App.2d 228, 252-253 [71 Cal.Rptr. 306] [applying the doctrine to suppliers and distributors]; *Kreigler* v. *Eichler Homes, Inc.* (1969) 269 Cal.App.2d 224, 227 [74 Cal.Rptr. 749] [applying the doctrine to builders of mass-produced homes].) The protections afforded by the doctrine have also been extended to include bystanders. (*Elmore* v. *American Motors Corp.* (1969) 70 Cal.2d 578, 586 [75 Cal.Rptr. 652, 451 P.2d 84, 33 A.L.R.3d 406].)

*Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d 413, addressed the question left open in *Cronin*: the definition of "defect." *Barker* recognized that there were at least two classes of defects in products—manufacturing and design. A manufacturing defect is one which results from an error in the production process. The product comes off the assembly line in a substandard condition: in some way it "differs from the manufacturer's intended result or from other ostensibly identical units of the same product line." (*Id.,* at p. 429.) Such defective products are relatively easy to identify.

The design defect is more difficult to identify. When the injury-producing agent is common to all the products of a certain line, the defect, if it exists, lies in the original design or model. To paraphrase Justice Traynor, there is something "wrong, . . . not in the manufacturer's manner of production,

[but] in his product." (Traynor, *The Ways and Meanings of Defective Products and Strict Liability* (1965) 32 Tenn.L.Rev. 363, 366.)

*Barker* promulgated two alternative standards for determining whether a product was defective in design. "First, a product may be found defective in design if the plaintiff establishes that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. Second, a product may alternatively be found defective in design if the plaintiff demonstrates that the product's design proximately caused his injury and defendant fails to establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design." (*Barker, supra,* 20 Cal.3d at p. 432.)

The relevant factors to be considered by the trier of fact, in balancing the benefits and the risks under the second test, include: "the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design." (*Id.,* at p. 431.) Thus, in keeping with the rationale of strict liability doctrine, *Barker* directed attention to factors concerning the product itself and not the reasonableness of the manufacturer's conduct. Similarly, the trier of fact was instructed to consider the safety of the product in light of the state of knowledge at the time of trial. (See *id.,* at pp. 430, 434.)

Although this court has never directly considered the application of strict liability principles to prescription drugs, the cases have not distinguished among types of products in determining the application or reach of the doctrine. Indeed, since *Greenman,* the trend of the law in California has been toward expansion of strict liability, in terms of parties, defenses and applicable standards.

The application of strict liability to prescription drugs has been addressed by several courts. Three federal circuit courts have expressly applied the doctrine in drug cases. In *Brochu* v. *Ortho Pharmaceutical Corp.* (1st Cir. 1981) 642 F.2d 652, the plaintiff suffered a cerebral thrombosis as a result of using an oral contraceptive. The First Circuit, applying New Hampshire law, held that the plaintiff could invoke strict liability under both a design defect theory pursuant to section 402A of the Restatement and a claim of failure to warn. (*Id.,* at pp. 654-659.) In *Reyes* v. *Wyeth Laboratories* (5th Cir. 1974) 498 F.2d 1264, cert. den., 419 U.S. 1096 [42 L.Ed.2d 688, 95 S.Ct. 687], the Fifth Circuit, applying Texas law, reached a similar conclusion with regard to Sabine oral polio vaccine. It found that under the Re-

statement, "the utility of the product properly used is weighed against whatever dangers of harm inhere in its introduction into commerce." (*Id.*, at p. 1274.)[10] Strict liability was also applied to a mixture of four vaccines in *Parke-Davis and Company* v. *Stromsodt* (8th Cir. 1969) 411 F.2d 1390, 1397-1399.

In California, two appellate court decisions have applied strict liability to injuries caused by vaccines. (*Grinnell* v. *Charles Pfizer & Co., supra,* 274 Cal.App.2d at pp. 432-434; *Gottsdanker* v. *Cutter Laboratories* (1960) 182 Cal.App.2d 602, 607 [6 Cal.Rptr. 320, 79 A.L.R.2d 290]; see also *Hutchinson* v. *Revlon Corp., supra,* 256 Cal.App.2d at p. 522 [cosmetics].)

In *Sindell* v. *Abbott Laboratories* (1980) 26 Cal.3d 588 [163 Cal.Rptr. 132, 607 P.2d 924, 2 A.L.R.4th 1061], this court clearly contemplated the application of strict liability law to prescription drugs. "From a broader policy standpoint, defendants are better able to bear the cost of injury resulting from the manufacture of a defective product. . . . [Quotation from Justice Traynor's concurrence in *Escola* omitted. (See *ante,* at p. 713.)] The manufacturer is in the best position to discover and guard against defects in its products and to warn of harmful effects; thus, holding it liable for defects and failure to warn of harmful effects will provide an incentive to product safety. [Citations.] These considerations are particularly significant where medication is involved, for the consumer is virtually helpless to protect himself from serious, sometimes permanent, sometimes fatal, injuries caused by deleterious drugs." (*Id.,* at p. 611.)

This passage from *Sindell* and the earlier quotation from Justice Traynor's concurrence in *Escola* identify the major policies served by strict liability: (1) compensation of victims by placing the cost of injury on the party best able to pay, and (2) deterrence of poor manufacturing, design, or testing procedures. Underlying these policies is the ethical justification for strict liability: in a complex industrialized society, the unfortunate consequences of technological progress should not be borne by the injured individual alone, but should be distributed among those who benefit from the product and who may be able to minimize injury in the future.

These considerations are equally applicable in the present situation. As with other products, drugs can cause serious injury, even if the manufacturer's production process has been a careful one. Millions of consumers use prescription drugs with no awareness of the potential risks involved.

---

[10]In *Reyes, supra,* the manufacturer was under a duty to warn the ultimate consumer, not just the physician, because the procedures used for obtaining the polio vaccines were generally unsupervised by physicians. (See *Reyes, supra,* 498 F.2d at p. 1277.)

When a defective drug has caused injury, society's interest demands that the cost not be shouldered exclusively by the innocent consumer. The manufacturer is in a far better position to absorb the cost of injury and prevent additional injury. In terms of the policies served by strict liability, drugs are no different than other products.

The present case supports this conclusion. Plaintiff used Diodoquin in a reasonably foreseeable manner. He now claims that he became blind as a result of his use of the product. If Diodoquin is found to be defective and the proximate cause of plaintiff's injury, Searle should be held liable as the manufacturer of the defective product. Certainly, Searle is better situated to absorb and spread the loss as a cost of doing business.

Holding drug manufacturers strictly liable for defects in their products may also result in safer drugs. If a manufacturer knows that liability may follow an injury, it will have a greater incentive to discover imperfections and improve its product. Once the manufacturer knows of the injury-producing effect, it can prevent liability by changing or eliminating the product (or, where feasible, issuing a different warning). Such activity will also enable manufacturers to gain a competitive advantage by producing better, safer drugs.

These considerations expose the flaw in Searle's argument that the prospect of liability may deter manufacturers from continuing to test their products after distribution. Economic realities may well work the other way, pushing manufacturers to discover defects early so as to minimize costly injuries. Moreover, drug manufacturers are already under a duty, imposed by the precepts of negligence liability, to keep abreast of developments regarding a product. (*Borel* v. *Fibreboard Paper Products Corporation* (5th Cir. 1973) 493 F.2d 1076, 1089, cert. den. (1974) 419 U.S. 869 [42 L.Ed.2d 107, 95 S.Ct. 127]; *O'Hare* v. *Merck & Company* (8th Cir. 1967) 381 F.2d 286, 291; *McEwen* v. *Ortho Pharmaceutical Corporation* (1974) 270 Ore. 375 [528 P.2d 522, 528-529]; 2 Harper & James, The Law of Torts (1956) § 28.4, p. 1541.) For these reasons, Searle's contention should be rejected. Far from deterring the continued testing of a product, strict liability would provide an incentive for the discovery and correction of imperfections.[11]

Searle may well be correct in arguing that the application of strict liability to manufacturers of prescription drugs will not materially affect the safety

---

[11]In addition, the injury itself would prompt investigation on behalf of a plaintiff. A plaintiff's doctors and experts would seek to discover the cause of the injury in the interest of his well-being.

of the product at the time it first goes on the market. (See Rheingold, *Products Liability—The Ethical Drug Manufacturer's Liability* (1964) 18 Rutgers L.Rev. 947, 1015.) Government regulation, if carried out properly, should insure that the product which reaches the market is as safe as possible at that time. A corollary of this argument, however, is that strict liability would not result in any significant delay in marketing, since a drug must already undergo extensive testing.

Finally, Searle claims that a manufacturer may decide against marketing a drug altogether so as to avoid the risk of future liability. However, given the competitive nature of the drug industry it is unlikely that a manufacturer will forego marketing a product which appears to be beneficial against illness. Furthermore, the argument is grounded on sheer speculation. "This suggestion is subject to serious doubt. It certainly should not shape the development of strict liability law in the absence of substantial supporting empirical data showing that the profit margin in the drug industry is so low that the industry could not bear the costs of the injuries its products cause. In the absence of such data, it would appear that the unavoidably high degree of risk associated with drugs makes such products especially appropriate subjects for strict liability law." (McClellan, *Strict Liability for Drug Induced Injuries: An Excursion Through the Maze of Products Liability, Negligence and Absolute Liability* (1978) 25 Wayne L.Rev. 1, 33, fn. omitted [hereinafter cited as *Drug Induced Injuries*];[12] see also Prosser, *The Assault Upon the Citadel (Strict Liability to the Consumer)* (1960) 69 Yale L.J. 1099, 1122.)

This examination of policy considerations and pertinent precedent clearly indicates that strict liability should apply to injuries caused by drugs. The concerns expressed by Searle are no different in kind than those faced by any industry in which strict liability has been applied.

*Greenman, Cronin* and *Barker* recognize that the imposition of strict liability promotes society's interest in compensating the victims of progress, spreading the cost of injuries and encouraging development of safe products. These policies apply just as forcefully in the present case, in which plaintiff claims to have been injured by use of Searle's product. His claim is no different than Greenman's, Cronin's, or Barker's; each of them asserted that his injuries resulted from a defective product. Plaintiff should not be denied the opportunity to prove the same simply because the product which allegedly caused his injury was a drug.

---

[12]McClellan notes that past studies have revealed a high profit margin for drugs. (*Drug Induced Injuries, supra,* at p. 33, fn. 104 [citing Harris, The Real Voice (1964) and Silverman & Lee, Pills, Profits & Politics (1974)]; see also Standard and Poors Industry Surveys for Health Care (July 9, 1981) at p. H-5.)

In the absence of any compelling evidence that strict liability will increase the dangers faced by consumers, there is no justification for the creation of an immunity for the manufacturers of medication. A prescription drug manufacturer should be held strictly liable for injuries caused by design or manufacturing defects in its product.

## IV.

The standard generally applied in strict liability cases should also apply to drug manufacturers.

As noted earlier, a product may be defective in its manufacture or design. A manufacturing defect occurs when an error in production results in a product which contains an unintended injury-causing agent. Such defects are usually easily recognizable and may be found in drugs as well as other products. (See *Gottsdanker* v. *Cutter Laboratories, supra,* 182 Cal.App.2d 602; cf. *Reyes* v. *Wyeth Laboratories, supra,* 498 F.2d 1264, 1273, fn. 14.) Where such a defect in the manufacturing process results in an impurity which subsequently causes injury, the injured party will have a cause of action in strict liability against the manufacturer.

A design defect is one which is endemic to an entire line of products. Although conforming to the manufacturer's specifications, the product contains a property which subsequently causes injury. In *Cronin* v. *J.B.E. Olson Corp., supra,* 8 Cal.3d 121, for example, the plaintiff claimed that a porous metal hasp designed to hold his truck's bread trays gave way on impact. Serious injury resulted. In the present case, plaintiff claims that the chemical properties of Diodoquin caused his blindness.

In the area of design defects, the applicable standard in California is the two-prong test announced in *Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d at p. 432. (See *ante,* p. 716.) The *Barker* test is easily adaptable to prescription drugs. Under the first prong of the test, the trier of fact must determine whether, under the circumstances present, the product met the ordinary consumer's expectations as to safety.[13] This standard is premised on the theory that the manufacturer of a product represents that the product will perform safely when used in a reasonably foreseeable manner.[14] If the

---

[13] Among the factors to be taken into consideration would be the plaintiff's medical history and any prior medical treatment.

[14] Any warning given by the manufacturer would certainly be relevant under this test. Thus, where the manufacturer has provided a sufficient warning that a particular injury is a normal side effect of the treatment, the manufacturer should not ordinarily be held liable for the injury under this prong. This is true whether or not the patient is advised of the danger by his physician. It would be unfair to impose liability on the manufacturer simply because the physician, to whom the manufacturer owes the duty to warn (see *Carmichael* v. *Reitz, supra,* 17 Cal.App.3d at p. 989), did not pass on an adequate warning.

product fails to live up to the ordinary consumer's reasonable expectations as to safety, the manufacturer should be liable for the damage caused by its product. Even if the chance of injury is slight, the burden of any resulting injury should be borne by the party best able to bear the loss.

The second prong of the *Barker* test is applicable to prescription drugs. Even if the product meets consumer expectations, liability will be imposed if the trier of fact determines that "the risk of danger inherent in the challenged design outweighs the benefits of such design." (*Barker, supra,* 20 Cal.3d at p. 430.) In other words, the jury determines whether marketing the product as designed is justified. This determination is made by an examination of the scientific evidence. Of course, as McClellan observes, a drug may "offer[] materially different risks and benefits to identifiable groups of consumers, based on age, health, etc." (*Drug Induced Injuries, supra,* at p. 4.) In such a case, the balancing test should be conducted in light of the characteristics of the "class or group within which the injured consumer fits." (See *ibid.*)[15]

The second *Barker* test focuses on the condition of the product and not on the reasonableness of the manufacturer's conduct. Thus, the jury's consideration of the relevant factors should be based on the knowledge available at the time of trial. The jury should consider any evidence concerning the risks of taking the drug, whether developed before or after the injury.[16]

---

[15]The balancing required by the second *Barker* test is similar to asking whether a reasonable patient, knowing the risks and benefits, would nonetheless continue to take the product (and incur the injury). This is the approach taken by Professor McClellan: "[A] product ought to be regarded as defective at the time of the sale if the ordinary consumer with knowledge of the product's condition, and an appreciation of all the risks and benefits found to exist by the jury at the time of the trial, would not now consume or use the product, or, if he did consume or use it, would do so pursuant to a different set of precautions or procedures as to its use. If the product offers materially different risks and benefits to identifiable groups of consumers, based on age, health, etc., the term ordinary consumer should be construed to mean the ordinary consumer in the class or group within which the injured consumer fits." (*Drug Induced Injuries, supra,* at p. 4; see also *Reyes* v. *Wyeth Laboratories, supra,* 498 F.2d 1264, 1274; Keeton, *Product Liability and the Meaning of Defect* (1973) 5 St. Mary's L.J. 30, 37-38.)

[16]However, in determining whether the risks inherent in the design of the drug outweigh the benefits, the trier of fact must assume that the plaintiff had the disease for which it was prescribed. If a doctor erred in diagnosing the plaintiff's condition, the benefits of the drug presumably will be negligible, and the risks associated with its use almost always will be greater than those benefits. The second *Barker* test calls for an objective determination of whether the risks of a product outweigh its benefits when used as intended. This objective determination should not be skewed by the fact that a particular plaintiff was misdiagnosed and therefore cannot be helped by the drug.

Nevertheless, a physician's negligent misdiagnosis should not necessarily enable a manufacturer to *escape* liability under *Barker.* If a drug is defective and proximately causes the injury, the manufacturer should be held liable even if it is found that the doctor was negligent in prescribing the drug. (See *McCue* v. *Norwich Pharmacal Company* (1st Cir. 1972) 453 F.2d 1033, 1035; *Sterling Drug, Inc.* v. *Cornish* (8th Cir. 1966) 370 F.2d 82, 85; *Hamilton*

In keeping with the rationale and purposes of *Barker,* the burden of proof on the issue of defect under the second prong of the *Barker* test should rest with the defendant. "Because most of the evidentiary matters which may be relevant to the determination of the adequacy of a product[] . . . under the 'risk-benefit' standard—e.g., the feasibility and cost of alternative designs—are similar to issues typically presented in a negligent design case and involve technical matters peculiarly within the knowledge of the manufacturer, we conclude that once the plaintiff makes a prima facie showing that the injury was proximately caused by the product[] . . . the burden should appropriately shift to the defendant to prove, in light of the relevant factors, that the product is not defective." (*Barker, supra,* 20 Cal.3d at p. 431.)

As the above discussion illustrates, the *Barker* standards are readily adaptable to prescription drugs. Further, those standards serve well to effectuate the policies underlying the strict liability doctrine.[17]

Therefore, the manufacturer of a drug should incur strict liability if the drug fails to meet ordinary consumer expectations as to safety or if the manufacturer fails to establish, based on the information available at the time of trial, that the benefits of the drug outweigh the risks.

---

v. *Hardy* (1976) 37 Colo.App. 375 [549 P.2d 1099, 1109].) However, in evaluating whether a defect exists, the misdiagnosis should be set aside and the trier of fact should assume that the plaintiff suffered from the disease for which the drug was prescribed.

[17]The *Barker* definitions of defect are superior to others which this court could adopt. For example, one commentator has suggested that no definition is necessary. However, this would provide little or no guidance for juries and trial courts. (See Beasley, Products Liability and the Unreasonably Dangerous Requirement (1981) p. 66.) Similarly, the test announced by the Pennsylvania Supreme Court—that a product must be provided with every element necessary to make it safe for use, and must contain no condition that makes it unsafe for use (*Azzarello* v. *Black Bros. Co., Inc.* (1978) 480 Pa. 547 [391 A.2d 1020, 1027])—is extremely vague and would be difficult to follow.

In *Phillips* v. *Kimwood Machine Company* (1974) 269 Ore. 485 [525 P.2d 1033], the Oregon Supreme Court adopted a test based on the proposals of Deans Wade and Keeton. Under this test, knowledge concerning the product available at trial is imputed to the defendant manufacturer. The jury is then asked to decide whether, knowing what it now knows, the manufacturer would be negligent in marketing the product as it did at the time of the sale to plaintiff. This approach is commonly designated "negligence with hindsight." (See Wade, *On the Nature of Strict Tort Liability for Products* (1973) 44 Miss.L.J. 825, 834-835; Keeton, *Manufacturer's Liability: The Meaning of "Defect" in the Manufacture and Design of Products* (1969) 20 Syracuse L.Rev. 559, 568.)

The Wade-Keeton test is similar to the second prong of the *Barker* test. The latter test, however, is preferable because it focuses the jury's attention on the condition of the product, not the reasonableness of the defendant's conduct, whether actual or theoretical. In this manner, it is designed to identify those products whose utility is outweighed by their propensity for injury, thus furthering the goal of eliminating products which, on balance, are not socially useful.

## V.

A final question before this court is whether plaintiff may base his strict liability claim on both design defect and failure-to-warn theories.[18]

The failure to warn of dangers inherent in a product is often delineated a category of defect separate from manufacturing or design defects. The injured plaintiff does not allege that the manufacture or design of the product was faulty, but that the manufacturer failed to warn of potential dangers in the use of its product. If the injury would have been prevented with proper warnings, the product is deemed defective. (*Midgley* v. *S.S. Kresge Co.* (1976) 55 Cal.App.3d 67, 71-72 [127 Cal.Rptr. 217] and cases cited therein.)

The key principle underlying the failure-to-warn cases is that the danger which caused the injury may have been unnecessary. Had the defendant supplier warned of the danger, the plaintiff could have altered his behavior and thereby reduced the risk of injury.

In the present case, plaintiff's theory of strict liability was predicated upon Searle's having failed to warn of a knowable danger. As noted earlier, the state of the case law at the time of trial was consistent with this theory. (See *ante,* pp. 709-711.)

However, whether knowledge of the danger is a necessary element in a failure-to-warn case has never been addressed by this court. (But see *Christofferson* v. *Kaiser Foundation Hospitals* (1971) 15 Cal.App.3d 75, 79-80 [92 Cal.Rptr. 825, 53 A.L.R.3d 292]; *Oakes* v. *E. I. Du Pont de Nemours & Co., Inc., supra,* 272 Cal.App.2d at p. 651.) There is a split of authority in other jurisdictions on this question. (See *Beshada* v. *Johns-Manville Products Corp.* (1982) 90 N.J. 191 [447 A.2d 539, 546]; *Woodill* v. *Parke Davis & Co.* (1980) 79 Ill.2d 26 [402 N.E.2d 194, 197].) The better rule is that liability should not be conditioned upon the manufacturer's having knowledge or reason to know of the danger.

Under strict liability, culpability is irrelevant. Instead, the issue is whether the manufacturer has supplied the consumer with a defective product. "That [a product] was unsafe because of the state of technology does not change the fact that it was unsafe." (*Beshada* v. *Johns-Manville Products Corp., supra,* 447 A.2d at p. 546.) Thus, whether or not the manufacturer had reason to know of the danger is irrelevant in determining whether the absence of a warning rendered the product defective.

---

[18]The jury found that the manufacturer was not *negligent* in failing to warn. Plaintiff has not challenged that finding on appeal.

The argument is made that imposing a "duty to warn" of unknowable dangers on manufacturers will require them to do that which is impossible. However, as the New Jersey Supreme Court has explained, "the phrase 'duty to warn' is misleading. It implies negligence concepts with their attendant focus on the reasonableness of defendant's behavior. However, a major concern of strict liability . . . is the conclusion that if a product was *in fact* defective, the distributor of the product should compensate its victims for the misfortune that it inflicted on them." (*Ibid.*, italics added.) A plaintiff alleging either a design defect or a manufacturing defect need not plead and prove that the danger was known. There is no reason to impose a greater burden on the plaintiff in a case in which the absence of a warning constituted the defect.[19]

This analysis is consistent with *Cronin* v. *J.B.E. Olson Corp., supra,* 8 Cal.3d 121, which abolished the "unreasonably dangerous" requirement in strict products liability cases. A requirement that liability be conditioned upon the manufacturer's knowledge of the danger would "ring of negligence." (See *id.,* at p. 132.) Such a requirement is, therefore, not a necessary element in a failure-to-warn case.

As previously noted, these principles of strict liability are equally applicable to cases involving prescription drugs. (See *ante,* pp. 716-719.) Thus, strict liability should be applicable to products—including drugs—rendered defective by the absence of a warning.[20]

---

[19]The Court of Appeal has explained that "[i]n assisting the [jurors'] determination of whether the absence of a warning makes a product defective, the trial court should focus their attention on such relevant considerations as the normal expectations of the consumer as to how the product will perform, degrees of simplicity or complication in the operation or use of the product, the nature and magnitude of the danger to which the user is exposed, the likelihood of injury, and the feasibility and beneficial effect of including a warning." (*Cavers* v. *Cushman Motor Sales, Inc.* (1979) 95 Cal.App.3d 338, 347-348 [157 Cal.Rptr. 142].)

[20]Searle raises another argument against deciding this type of case under a duty to warn rationale. Since the warnings which drug manufacturers provide are strictly regulated by federal law (see 21 C.F.R. § 201.57, subds. (d), (e), (g)), it would be illegal and a violation of public policy for the manufacturer to warn about adverse reactions and contraindications which have not been substantiated. A manufacturer should not be held liable for obeying the law. Similarly, this court should not encourage violation of the important policies served by stringent warning requirements. Unlike producers in other areas of commerce, a drug manufacturer must guard against overwarning since the information it provides to physicians will reasonably be relied upon in treating illnesses.

While these are important considerations, this court has stated that "mere compliance with regulations or directives as to warnings, such as those issued by the United States Food and Drug Administration . . ., may not be sufficient to immunize the manufacturer or supplier of the drug from liability. The warnings required by such agencies may be only minimal in nature and when the manufacturer knows of, or has reason to know of, greater dangers not included in the warning, its duty to warn may not be fulfilled." (*Stevens* v. *Parke, Davis & Co.* (1973) 9 Cal.3d 51, 65 [107 Cal.Rptr. 45, 507 P.2d 653, 94 A.L.R.3d 1059]; see also

## VI.

The rule of strict liability should be applicable to injuries caused by prescription drugs under the two prong test of *Barker*. A manufacturer of a drug should be liable for the injuries caused by its product if that product fails to live up to the ordinary consumer's expectations as to safety, or the manufacturer fails to establish that the benefits of the particular drug outweigh the risks attendant to its use. Strict liability should also be applicable to injuries caused by drugs which are rendered defective by the absence of a warning.

Since the trial court failed to instruct on any theory other than negligence, the judgment in favor of defendant Searle should be reversed. The judgment in favor of Dr. McGillis should be affirmed.

---

*Brochu* v. *Ortho Pharmaceutical Corp., supra,* 642 F.2d 652, 658 ["'[A]pproval by the FDA of the language involved is *not necessarily conclusive* on the question of the adequacy of the warnings.'"]; Note, *The Liability of Pharmaceutical Manufacturers for Unforeseen Adverse Drug Reactions* (1980) 48 Fordham L.Rev. 735, 742, fn. 40.)

Moreover, even if the link between blindness and Diodoquin was not sufficiently substantiated under federal law, Searle was not totally precluded from informing the medical profession of that risk. Federal law only regulates the content of labels contained in the drug package. (See 21 C.F.R. §§ 201.56, 201.57.) As the Commissioner of the Food and Drug Administration has explained, "[l]abeling is not intended to be a dispositive treatise of all possible data and information about a drug." (44 Fed.Reg. 37441 (June 26, 1979).) Indeed, "[t]he Commissioner shares the concern . . . that communication of significant medical information should be encouraged, not restricted." (*Ibid.*)

Methods other than labeling were available to Searle for informing the medical profession of dangers associated with the use of Diodoquin. These included advertising and promotional literature, letters to the medical profession and oral communications by sales representatives. (See, e.g., *Love* v. *Wolf* (1964) 226 Cal.App.2d 378, 383-384 [38 Cal.Rptr. 183] [letters, advertisements and promotional material].) Searle could have used these means to inform the medical profession of the possible link between blindness and Diodoquin whether or not that risk was sufficiently substantiated to be included on the drug package label.