Beverly O'HARE, Appellant,

v.

MERCK & COMPANY, Inc., a New Jersey Corporation, also known as Merck, Sharp & Dohme, Appellee.

No. 18581.

United States Court of Appeals
Eighth Circuit.

July 19, 1967.

Rehearing Denied Aug. 29, 1967.

Harvey E. Skaar, Minneapolis, Minn., for appellant.

G. Alan Cunningham, Minneapolis, Minn., for appellee and filed brief with Paul J. McGough, Faegre & Benson, Minneapolis, Minn.

Before VAN OOSTERHOUT, MATTHES and LAY, Circuit Judges.

MATTHES, Circuit Judge.

This products liability case involves a prescription drug manufactured and sold by appellee Merck & Company, Inc. (defendant below). Beverly O'Hare, a Minnesota citizen, filed suit in federal court to recover damages resulting from the development and subsequent surgical removal of a non-specific lesion in the small intestine, also referred to in the record as an ulcer or bowel lesion. She premised her cause of action on the theory that the lesion was caused by her use of HydroDIURIL Ka–50, hereinafter referred to as Ka–50. Between January 17, 1964 and April 15, 1964, appellant had taken about forty of the Ka–50 pills. She was overweight and her legs swelled due to the excess fluids in her body. Her doctor prescribed three medicines, one being Ka–50. In March, 1964, she experienced abdominal pains, was hospitalized and discharged in an improved condition. She reentered the hospital on April 13th when the abdominal pains reoccurred, and surgery followed on April 15th. At the time of its removal the cause of appellant's lesion was unknown.

The case was tried and submitted to the jury solely on the alleged negligence of appellee in failing to engage in more extensive research and testing of the drug before placing it on the market, and in failing to adequately warn doctors who prescribed the drug that it could produce a condition such as that experienced by appellant.

Appellee filed a timely motion for a directed verdict at the close of all the evidence but the Court, Judge Nordbye, although entertaining doubt as to the sufficiency of the evidence to establish negligence, submitted the case to the jury which returned a verdict in favor of the appellant for $5,000.00. Thereafter the Court granted appellee's motion for judgment n. o. v. and entered judgment dismissing the case on the merits.[1] This appeal is from that judgment.

Judge Nordbye found that the evidence was sufficient to support a finding of a causal connection between the use of Ka–50 and the small bowel lesion found in appellant. Appellee does not challenge that finding. We are therefore faced with but one issue, i. e., whether the evidence was sufficient to present a fact question on the issue of the negligence of appellee with respect to testing the drug and giving an adequate warning prior to placing it on the market.

We again take note of the Supreme Court's observation in Dick v. New York Life Insurance Co., 359 U.S. 437, 444–445, 79 S.Ct. 921, 3 L.Ed.2d 935 (1959), that the question whether it is proper to apply a state or federal test of the sufficiency of the evidence to support a jury verdict where federal jurisdiction is rested on diversity of citizenship remains unsettled.[2] See also Mercer v. Theriot,

1. Judge Nordbye, an able and experienced judge, in characteristic style clearly delineated his reasons for holding that the evidence was insufficient as a matter of law to establish negligence on the part of appellee. The Judge emphasized that prior to the introduction of Ka-50, the diuretic and potassium chloride had been administered in two separate pills, and consequently when appellee introduced Ka-50, a combination of a diuretic and potassium chloride in a one pill form, it did not put a new, untried drug on the market; that prior to the fall of 1964 no one suspected that potassium chloride might have some deleterious effect on the small bowel. Judge Nordbye further observed that in view of the long and medically approved use of potassium chloride there was no occasion for appellee to conduct a more extensive research program before it marketed the one pill form:

"The suggestion, therefore, that Merck & Company in the exercise of reasonable care should have made a more extensive investigation as to the effect of potassium chloride released in the small bowel by examining hospital records as to any effects on patients therein by reason of their use of potassium chloride, or to make a more extended research on the effects of potassium chloride on various animals, etc., is to base a claim for damages on the principle of unmitigated hindsight."

2. Judge Lumbard, however, recently observed that the majority of circuits have held that the Erie doctrine is "subservient to * * * the kind of jury trial in federal courts that is preserved by the

377 U.S. 152, 156, 84 S.Ct. 1157, 12 L.Ed.2d 206 (1964). We have similarly left the question open. See *Jiffy Markets, Inc. v. Vogel*, 340 F.2d 495, 498 (8th Cir. 1965); *Hanson v. Ford Motor Company*, 278 F.2d 586, 589 (8th Cir. 1960).

Since the test to be applied is not in issue here, we again decline to take a definitive position on the question. In *Land O'Lakes Creameries, Inc. v. Hungerholt*, 319 F.2d 352 (8th Cir. 1963) and *Ford Motor Company v. Zahn*, 265 F.2d 729 (8th Cir. 1959), cited by appellant, we reiterated the familiar rule that all disputed fact questions and permissible inferences must be viewed in the light most favorable to the plaintiff, and only where all or substantially all of the evidence is on one side should a directed verdict be entered. Appellee does not contend otherwise, and therefore we will apply that test in ruling on the question presented.[3]

The pertinent facts are not in dispute. Ka–50 is a coined trademark for appellee's combination of Hydrochlorothiazide and potassium chloride. HydroDIURIL is appellee's trade name for Hydrochlorothiazide, which is the diuretic. The designation "Ka" indicates the presence of potassium chloride. Ka–50 is a combination of 572 mg. of potassium chloride in enteric coated form and 50 mg. of Hydrochlorothiazide. The diuretic increases the urine flow and rids the body of excessive fluids. It is also effective in the treatment of certain heart conditions. Diuretics have been used for many years by the medical profession, but until the discovery of the thiazides by appellee in the mid 1950's, the diuretics then offered were not very effective. HydroDIURIL became available as a prescription drug in 1958 after approval by the Food and Drug Administration. Prior to favorable action by that Agency, appellee had conducted extensive animal and human testing.

HydroDIURIL had the known effect of reducing the body's content of potassium. In order to overcome the potassium deficiency, it was a generally accepted practice for doctors to prescribe potassium chloride. It stands undisputed that the latter has a long history of accepted and safe use by the medical profession. The evidence also shows, however, that potassium chloride was a known irritant when taken in a non-enteric form. It caused nausea, gastric irritation, had "a bitter taste [and] patients just wouldn't stay on it." Since about 1950, however, enteric coated potassium chloride in a single pill form has been in common use.[4]

The enteric coating permitted the pill to pass through the stomach into the small intestine where the potassium chloride gradually dissolved. By preventing dissemination in the stomach the side effects of nausea and bitter taste were eliminated.

It is also uncontroverted that Ka–50 is a combination of the two previously used and accepted pills and was designed primarily to provide all of the needed medication in a single pill. In this form, the core of the pill is the potassium chloride, surrounded first, by an enteric coating and then 50 mg. of Hydrochlorothiazide. As in the two-pill process the Hydrochlorothiazide, or diuretic, is dissolved in the stomach, but the potassium chloride, because of the enteric coating, does not dissolve until it reaches the small intestine.

---

Seventh Amendment, * * * and that the federal standard should be applied where the issue is the sufficiency of the evidence required to take the case from the jury." *Mull v. Ford Motor Company*, 368 F.2d 713, 716, n. 4 (2d Cir. 1966).

3. Substantially the same test has been applied by the Minnesota Supreme Court. *McCormick v. Malecha*, 266 Minn. 33, 122 N.W.2d 446, 450 (1963); *Lott v. David-*

son, 261 Minn. 130, 109 N.W.2d 336, 341 (1961); *Quick v. Benedictine Sisters Hospital Association*, 257 Minn. 470, 102 N.W.2d 36, 39 (1960).

4. Enteric pertains to the alimentary canal or intestine. One doctor testified it referred to the "small intestine" and that enteric coating means the pill is dissolved in the small intestine.

Prior to the distribution of Ka–50 on the market appellee conducted several premarketing tests which consisted of chemical studies begun in March, 1959 and continued until the filing of appellee's application with the Food and Drug Administration. Tests were conducted by a number of clinical investigators on humans. The product was administered to patients with various cardiovascular disorders. These tests established the safety and efficacy of the drug under normal conditions of use, subject to the warning and precautions appearing in appellee's literature. Of 136 humans tested there was no indication that Ka–50 did or would produce lesions in the small bowel. A few of the patients experienced an upset stomach or gastrointestinal complaints. These side effects were recognized and incorporated in appellee's basic information booklet to physicians. The results were submitted to the Food and Drug Administration and on June 9, 1960 that Agency approved appellee's application and authorized sale of Ka–50. Since July 1, 1960 the combination pill has been used extensively as have similar thiazide and hydrochlorothiazide enteric coated pills of at least three other drug manufacturers.[5]

Prior to September, 1964 the medical profession was wholly unaware of a causal relationship between potassium chloride and lesions in the small bowel. On September 28, 1964 a Swedish publication appeared, followed in November of 1964 by an American article, which indicated that there was a causal relation between potassium chloride and non-specific lesions in the small intestine, a number of which had been discovered prior to the publication of the two articles. Appellee acted promptly after the articles appeared. Between mid-October and mid-December, 1964 it conducted a study covering a period which varied from five to ten years prior to December 18, 1964. That study revealed 395 cases of small bowel lesions. Approximately half of the individuals tested had a history of using potassium chloride. Small monkeys weighing five to ten pounds were administered heavy doses of Ka–50 and lesions developed in a high proportion of the animals tested. The results of the studies and tests were reported to the Food and Drug Administration, which requested all manufacturers to supplement the warning previously given to doctors by including therein the information that small bowel lesions may occur with enteric coated potassium tablets alone or when they are used with non-enteric coated thiazides or certain other oral diuretics. Pursuant to this request appellee mailed an appropriate statement to all physicians.

In urging that the court erred in vacating the judgment, appellant argues in part that the irritating qualities of potassium chloride were well known for many years prior to the advent of Ka–50; that in assuming the safety of potassium chloride in the combination form appellee improperly relied on the fact that that drug had been used in the medical field since 1951; that in view of the known irritating quality of potassium chloride appellee was negligent in testing only 136 patients prior to marketing Ka–50 and in not making more extensive studies and tests on animals as it did subsequent to the published reports.

We turn now to the standard of care imposed upon a manufacturer of drugs. The increase in products liability litigation has brought forth a body of law dealing with the duty of manufacturers of drugs. See Rheingold, Products Liability—The Ethical Drug Manufacturer's Liability, 18 Rutgers L.Rev. 947 (1964); Dillard & Hart, Product Liability: Directions for Use and Duty to Warn, 41 Va.L.Rev. 145 (1955).

■ It is firmly established, and not disputed by appellant, that a manu-

5. Appellee had sold 247,264,700 Ka-50 pills, in the combined tablet, from 1960 through October 1, 1965.

facturer of *ethical* [6] drugs is not an insurer with respect to the products with which he deals. Cudmore v. Richardson-Merrell, Inc., 398 S.W.2d 640, 644 (Tex.Civ.App.1966); Lewis v. Baker, 413 P.2d 400, 403 (Or.1966); cf. E. I. DuPont De Nemours & Co. v. Baridon, 73 F.2d 26, 31 (8th Cir. 1934); Martin v. Bengue, Inc., 25 N.J. 359, 136 A.2d 626 (1957); Ebers v. General Chemical Co., 310 Mich. 261, 17 N.W.2d 176, 182 (1945); 1 Hursh, American Law of Products Liability, § 2:3 (1961). It has the duty to exercise ordinary and reasonable care not to expose the potential consumer to an unreasonable risk of harm from the use of its products. The failure to meet this standard of due care in light of all the attendant circumstances will constitute negligence and subject the manufacturer to liability for the resulting consequences. The fact that the consumer's injuries were proximately caused by the manufacturer's product does not in and of itself constitute a sufficient basis upon which to predicate the manufacturer's liability. When the cause of action sounds in negligence, a manufacturer's duty to additionally test and investigate the propensities of its product is dependent upon the foreseeable risk of harm to potential users in light of current scientific or medical knowledge and discoveries. Wright v. Carter Products, Inc., 244 F.2d 53, 56–57 (2d Cir. 1957); Howard v. Avon Products, Inc., 155 Colo. 444, 395 P.2d 1007, 1011 (1964); Cudmore v. Richardson-Merrell, Inc., supra; Braun v. Roux Distributing Company, 312 S.W.2d 758, 763–764 (Mo.1958); cf. Lartigue v. R. J. Reynolds Tobacco Company, 317 F.2d 19, 40 (5th Cir. 1963), cert. denied, 375 U.S. 865, 84 S.Ct. 137, 11 L.Ed.2d 92 (1963).

A manufacturer is held to the skill of an expert in its particular field of endeavor, and is obligated to keep informed of scientific knowledge and discoveries concerning that field. Guffie v. Erie Strayer Company, 350 F.2d 378, 381 (3rd Cir. 1965); Braun v. Roux Distributing Company, supra, 312 S.W.2d at 763; La Plant v. E. I. DuPont De Nemours and Company, 346 S.W.2d 231, 240 (Mo.App. 1961); 2 Harper & James, The Law of Torts, § 28.4 (1956). The manufacturer is held accountable as an expert in its field only for those dangers of which it has knowledge or those which it could discover through the exercise of reasonable care.[7] Liability will not attend those injurious consequences resulting from the use of a product, the harmful effects of which "no developed human skill or foresight can afford knowledge." Ross v. Philip Morris & Company, 328 F.2d 3, 6 (8th Cir. 1964).

■ The manufacturer's duty to warn users of the potential danger inherent in its product is commensurate with its actual knowledge of the risk involved to those users or the knowledge constructively imparted to it by available scientific or other medical data. Land O'Lakes Creameries, Inc. v. Hungerholt, 319 F. 2d 352, 360 (8th Cir. 1963); Gober v. Revlon, Inc., 317 F.2d 47, 51 (4th Cir. 1963); Howard v. Avon Products, Inc., supra, 395 P.2d at 1011–1012; Vanoven v. Hardin, 233 Ark. 301, 344 S.W.2d 340, 342–343 (1961).

Appellant does not assert, and the evidence does not prove, that Ka–50 contained any foreign ingredient, substance, or other impurity that rendered it inherently dangerous or unfit for human consumption,[8] nor is there any evidence

---

6. The term "ethical drug" is used here in contradistinction to patent drugs sold over the counter, and refers to those prescription drugs which cannot be sold safely except under the supervision of a practitioner. See Rheingold, op. cit. supra.

7. In his charge to the jury, to which no exception was taken, Judge Nordbye carefully delineated essentially the same

test of the manufacturer's liability in negligence, measured by appellee's knowledge of the circumstances up to the time of appellant's injury. Appellant on appeal, moreover, does not contend that the test should be otherwise.

8. Rheingold, op. cit., supra at 970, observes that a majority of the decided ethical drug cases have arisen from harm caused by impure drugs rather than pure ones.

to establish that the diuretic and potassium chloride in the one-pill form was any different in content from the same drugs as they were previously administered in the two-pill form. The therapeutic action of the drugs combined into Ka–50 was identical to their action in the two-pill form.

It is true that potassium chloride was a known irritant. This fact is emphasized by appellant in support of her contention that appellee's premarketing testing of Ka–50, limited to 136 humans, was wholly inadequate particularly in light of the studies and tests which appellee conducted after it learned of a possible relationship between potassium chloride and small bowel lesions. Aside from the known irritating quality of potassium chloride in nonenteric form and the events which occurred after September, 1964, this contention finds no support in the record. Appellant made no attempt to establish by direct evidence that the premarketing tests were inadequate or did not conform to the care and skill which a manufacturer is required to exercise. Moreover, the irritation was confined to the stomach where the potassium chloride in nonenteric form would dissolve. It was precisely this side effect that spawned enteric coated potassium chloride pills. In view of these circumstances therefore we must judge appellee's liability on the basis of scientific knowledge available to it at the time the drug was placed in the stream of commerce.

Neither party attempts to analogize the injurious consequences resulting from the use of Ka–50 to those situations where the product involved produces harmful results to a small and limited number of persons who were allergic or hypersensitive to certain ingredients present in the product. See, e. g., Sterling Drug, Inc. v. Cornish, 370 F.2d 82 (8th Cir. 1966); Magee v. Wyeth Laboratories, Inc., 214 Cal.App. 2d 340, 29 Cal.Rptr. 322 (1963); Braun v. Roux Distributing Company, supra; Wright v. Carter Products, Inc., supra. The fact remains, however, that the post-September, 1964 studies revealed that potassium chloride might produce small bowel lesions in a minuscule percentage of individuals. Even if we apply the test in the allergy cases, it is of no avail to appellant since there is a total lack of evidence that appellee had actual or constructive knowledge, before it made Ka–50 available in July, 1960, of the possible harmful effects to a relatively few consumers.

We have considered all of appellant's authorities and those revealed by independent research. None of them compels a reversal of the court's judgment. In the final analysis the crucial question for determination is a fairly simple one. Does the evidence, tested by the proper standard, present a fact issue as to whether appellee in the exercise of the degree of care imposed upon it failed to make adequate research and tests before making Ka–50 available as a prescription drug? In view of (a) the long history of frequent, continuous, and successful use of enteric coated potassium chloride, (b) the lack of actual knowledge by appellee of the harm its product might cause to some users at the time appellant became a consumer, and the lack of scientific knowledge at that time so as to charge appellee with knowledge, and (c) the total absence of any evidence that administering potassium chloride and the diuretic in one pill would produce adverse side effects not experienced when those drugs were administered separately, we, like Judge Nordbye, are forced to conclude that resort to hindsight would be required in order to sustain the jury's verdict.

Inasmuch as there was no actionable negligence in regard to testing, it follows that the precautions imparted to the medical profession by appellee at the time Ka–50 was placed on the market were adequate and comported with the duty to warn. Obviously, appellee was not required to warn of a possible adverse side effect of which it had no actual or constructive knowledge.

Affirmed.

## ON PETITION FOR REHEARING

### PER CURIAM.

The petition for rehearing by the panel and by the Court en banc is denied, and to the extent that the petition may be considered as a motion for a new trial, the motion for a new trial is denied.

LAY, Circuit Judge (concurring in part and dissenting in part).

This suit arose from the plaintiff's use of a drug manufactured by defendant. The case was submitted to the jury solely on the issue of negligence. The jury returned a verdict for the plaintiff and the trial court granted defendant's motion for judgment n. o. v. on the ground that the plaintiff's proof was insufficient to sustain any finding of actionable negligence. The plaintiff appealed to this court and we affirmed the trial judge's order denying plaintiff-appellant relief.

In regard to appellant's petition for rehearing, I concur with the majority in overruling the petition for rehearing as to the claimed error of this court in our original opinion. This court does not feel that appellant has raised any overlooked point of merit affecting those issues thoroughly considered in the original appeal as set forth in Judge Matthes' excellent opinion.

However, filed with appellant's petition for rehearing and incorporated therein is a motion to this court to grant appellant a new trial on the ground that the trial court erred in failing to instruct the jury on implied or express warranty. Appellant contends that warranty counts were pleaded and that a request was made to the trial court to make such instruction. Admittedly, the record on appeal is incomplete with regard to the request for the instruction and as to claimed abortive attempt to amend. However it does appear that the complaint alleges that "the defendant falsely and fraudulently represented" that the drug was harmless. Such an allegation under the liberal concepts of federal pleading can be said to state a claim for relief on an implied or express warranty. See Fed.R.Civ.P. 8(a). See also Prosser Law of Torts, § 97 at 678–81 (3d ed. 1964). Again, there is ambiguity in the record as to whether appellant's counsel, in his colloquy with the trial judge, waived his claim of implied warranty. However, an intentional waiver seems doubtful in the light of his request for an instruction on implied warranty.

Under these circumstances, I feel the case should be remanded to the district court so that the trial judge with a complete record before him, can review for the first time the grounds for new trial.[1] Before this court rules upon such issues, now initially raised before us, the trial court ordinarily should have an opportunity to pass upon the question. It is for obvious reasons that the trial court is the preferred forum in which to urge a new trial. Cone v. West Virginia Pulp & Paper Co., 330 U.S. 212, 215–216, 67 S.Ct. 752, 91 L.Ed. 849 (1946); Globe Liquor Co. v. San Roman, 332 U.S. 571, 573–574, 68 S.Ct. 246, 92 L.Ed. 177 (1948); Weade v. Dichmann, Wright & Pugh, Inc., 337 U.S. 801, 69 S.Ct. 1326, 93 L.Ed. 1704 (1949). This is particularly true where the record before the appellate court is incomplete.

I feel it is incumbent upon this court to remand to the district court so that the trial judge might entertain appellant's motion in view of the complete record. At the very least, it would be salutary to allow both parties an opportunity to be heard in this court on their respective contentions in light of appellant's motion for new trial.

In Neely v. Martin K. Eby Constr. Co., 386 U.S. 317 at 329–330, 87 S.Ct.

---

1. In Neely v. Martin K. Eby Constr. Co., 386 U.S. 317, 329, 87 S.Ct. 1072, 1080, 18 L.Ed.2d 75 (1967), the Court implies that remand is appropriate to make the record sufficient so that the trial court can make an informed ruling on the motion for new trial.

1072, at 1080, 18 L.Ed.2d 75 (1967), the Supreme Court stated after the Court of Appeals had granted a judgment n. o. v., and although a motion for new trial was not presented by the verdict-holder on appeal nor by a petition for rehearing, that "It was, of course, *incumbent* on the Court of Appeals to consider the new trial question in the light of its own experience with the case. But we will not assume that the court ignored its duty in this respect, although *it would have been better had its opinion expressly dealt with the new trial question.*" (Emphasis mine)

The appellant in his motion for rehearing prays as follows:

"If the application of the law of implied warranty was and is essential to the determination of justice in this matter, plantiff respectfully requests a rehearing on this issue, or that this Court upon its own motion vacate its judgment and remand this case for a new trial to be submitted to the jury on the basis of the theory of warranty as originally pleaded by the appellant."

While it is true that this motion is entitled only a "petition for rehearing," we are required to treat the pleading broadly and look for matters of substance rather than matters of form. See Fed. R.Civ.P. 8(f). There should be little doubt that appellant has moved not only for reconsideration of the court's previous rulings but also for the first time, for a new trial. The denial of rehearing can only relate to matters upon which appellant has already had a hearing. See Rule 15, U.S.Ct.App. (8 Cir.). The problems presented by appellant on his motion for new trial, however, are original at this point.

It may be argued that appellant has waived his motion for new trial by failing to move, before the trial court pursuant to Fed.R.Civ.P. 50(c) (2).[2] However, the

Advisory Committee's note to Rule 50(c) (2) explains as follows:

"Even if the *verdict-winner makes no motion for a new trial,* he is entitled upon his appeal from the judgment n. o. v. not only to urge that the judgment should be reversed and judgment entered upon the verdict, but that errors were committed during the trial which at the least entitle him to a new trial." 31 F.R.D. 646 (1962). (Emphasis mine)

The Supreme Court gives approval to this viewpoint in Neely v. Martin K. Eby Constr. Co., supra, 386 U.S. at 328, 87 S.Ct. at 1079, when it states:

"Likewise, if the plaintiff's verdict is set aside by the trial court on defendant's n. o. v. motion, plaintiff may bring these very grounds directly to the court of appeals without moving for a new trial in the district court."

Therefore, it is clear that appellant has not waived any rights by failing to make his motion for new trial in the court below. There are practical and cogent reasons for this rule of nonwaiver, in that a verdict-winner appealing from a judgment n. o. v. primarily desires a review of that judgment and a reinstatement of the verdict. He is generally not interested in pursuing an immediate new trial order, which, if granted by the trial court, could supersede the appealable judgment. If a new trial would be granted the verdict-winner is left with no opportunity to obtain review of his original judgment. Of course, the trial court could enter a conditional order of a new trial as well as granting the n. o. v., under Fed.R.Civ. P. 50(b) and (c), but even under these circumstances the plaintiff may be reluctant to move for a new trial because of the uncertainty that the order will be conditional.

The only serious question is whether the appellant in this case was required to

---

**2.** "The party whose verdict has been set aside on motion for judgment notwithstanding the verdict may serve a motion for a new trial pursuant to Rule 59 not later than 10 days after entry of the judgment notwithstanding the verdict." Fed.R.Civ.P. 50(c) (2).

raise the issue of a new trial in his original appellate brief or whether he could wait for our ruling on the judgment n. o. v. before moving for a new trial along with his petition for rehearing. Again, I feel this is answered by Mr. Justice White in the *Eby* opinion:

> "*Moreover the appellee can choose for his own convenience when to make his case for a new trial:* he may bring his grounds for new trial to the trial judge's attention when defendant first makes an *n. o. v.* motion, he may argue this question in his appellee's brief to the court of appeals, or he may *in suitable situations seek rehearing from the court of appeals after his judgment has been reversed.* * *

> " * * * If appellee presents no new trial issues in his brief *or in a petition for rehearing,* the court of appeals *may,* in any event, *order a new trial on its own motio nor refer the question to the district court,* based on factors encountered in its own review of the case." 386 U.S. at 328–329, 87 S.Ct. at 1080 (Emphasis mine)

The above discussion relates to the situation under Rule 50(d) where the verdict-holder was the appellee, but there exists no apparent reason why the same statement is not applicable where the verdict-holder is the appellant.

In Smith v. American Guild of Variety Artists, 368 F.2d 511, 514 (8 Cir. 1966), we emphasized our rule that matters not raised upon appeal in brief or argument will ordinarily not be passed upon by an appellate court. However, the policy of this rule is not contravened by allowing a verdict-winner to move for new trial for the first time on petition for rehearing. Here we are not necessarily faced with new substantive problems.[3] We are faced for the first time with a request by appellant for a new remedy. It is my singular opinion, *disagreeing with the majority,* that whenever the motion presents arguable grounds, even though raised for the first time with a petition for rehearing, we should allow the trial court to pass upon the motion for new trial, unless upon its face it should be granted or denied. Cf. Cone v. West Virginia Pulp and Paper Co., supra.

I emphasize this is only the viewpoint of one judge on the panel. The majority ruling herein, should make every verdict-holder-appellant cautious to assert the grounds for a new trial in his main brief. I simply feel that this ruling, although perhaps more orderly and traditional, is contrary to the liberal spirit of the rules and the pragmatic development of procedural fair play.[4] I feel it likewise contrary to the logic and spirit of the *Neely* case, as well as Weade v. Dichmann, Wright & Pugh, Inc., supra.[5]

---

3. Neither the *Smith* case nor any of the authorities relied upon, pertain to motions for new *remedies.* Each authority is referring to the failure to raise a specific question or questions of law.

4. Mr. Justice Black, dissenting said:

   "This issue of whether a new trial is justified after a verdict is set aside either by a trial or an appellate court *is a new issue which it was not necessary to decide in the original trial.* It is a factual issue and that the trial court is the more appropriate tribunal to determine it has been almost universally accepted by both federal and state courts throughout the years." (My emphasis)   Neely v. Martin K.

Eby Constr. Co., 386 U.S. at 337, 87 S.Ct. at 1084.

5. Mr. Justice Black in dissent urged a remand for a *hearing* on a new trial before the District Court in *Neely.* The Supreme Court denied the remand because it had not been raised in the Court of Appeals, *even on rehearing.* We now foreclose the right to raise the motion on rehearing. Mr. Justice Black in his dissent, reflects the summary of *Weade,* apropos here:

   "There we ordered the case remanded to the trial court to pass on petitioner's motion for new trial because petitioner suggested to this Court that there was an alternative theory presented by the

Until the court of appeals has finally ruled on the granting of defendant's motion for judgment n. o. v., the verdict-holder's single purpose is to reinstate the verdict he obtained below from the jury. Until he sees finality in the judgment invalidating that verdict, again, he is not interested in even suggesting a new trial. In fact, in the court of appeals in many instances his argument that the jury verdict was proper under the record could be vitiated by his simultaneous emphasis on errors in the trial. Inconsistent pleas and alternative motions in his original briefs would add to his already heavy burden of persuasion. This would, of course, not always be true since frequently similar grounds could underlie both his appeal and his motion for new trial.

In the instant case plaintiff's complaint was broad enough to include a claim for relief for breach of either an express or implied warranty. Based upon Exhibit 8, there would appear to be evidence sufficient to sustain the submission of implied or express warranty.

The case should be remanded to the trial court so that the record can be made complete, and the trial judge can review the motion. We cannot adequately pass on the motion ourselves when the record is incomplete as to the error claimed. At the very least, I feel both parties should have an opportunity in this court to argue and prepare briefs on the matters now raised by appellant for the first time on his motion for new trial. The majority order denies the appellant the opportunity to be heard. In this phase of the order I respectfully dissent.

complaint and evidence. However, nowhere in the record in that case was it indicated that petitioner had argued this alternative theory in the Court of Appeals, and nothing in our opinon indicates any such requirement. The Court correctly summarizes *Weade* as

holding that 'an appellate court may not order judgment *n. o. v.* where * * * *the record reveals a new trial issue which has not been resolved.*' (Emphasis added.)" Neely v. Martin K. Eby Constr. Co., 386 U.S. at 343, 87 S.Ct. at 1087.