Carol MACK and Aaron
Mack, Plaintiffs,

v.

STRYKER CORPORATION, and
Stryker Sales Corporation,
Defendants.

Civ. No. 10–2993 (PAM/JJG).

United States District Court,
D. Minnesota.

Aug. 14, 2012.

Colin P. King, Dewsnup, King & Olsen, Jessica A Andrew, Paul M. Simmons, Dewsnup, King & Olsen, Salt Lake City, UT, Yvonne M. Flaherty, Lockridge Grin-

dal Nauen PLLP, Minneapolis, MN, for Plaintiffs.

Hall Marston, Sedgwick LLP, Los Angeles, CA, Timothy P. Griffin, Brian W. Thomson, Leonard Street and Deinard, PA, Minneapolis, MN, Wayne A. Wolff, Sedgwick LLP, San Francisco, CA, Vaughn A. Crawford, Snell & Wilmer LLP, Phoenix, AZ, for Defendants.

## MEMORANDUM AND ORDER

PAUL A. MAGNUSON, District Judge.

This matter is before the Court on Defendants' Motion for Summary Judgment, Defendants' Motion to Exclude the Testimony of Dr. Stephen Trippel Re "Safety Testing" and State of the Scientific Literature for Notice, and Plaintiffs' Motion to Limit or Exclude. Defendants' Experts as Cumulative. For the reasons that follow, the Court grants Defendants' Motion for Summary Judgment and denies the remaining Motions as moot.

## BACKGROUND

### A. Mack's Surgery

Plaintiff Carol Mack had arthroscopic shoulder surgery at Allina Hospital in Fridley, Minnesota on August 1, 2002. Dr. Paul Diekmann performed the surgery. After surgery, Dr. Diekmann implanted in Mack's shoulder a pain pump sold by Defendant Stryker Corporation.[1] The pump was designed to deliver anesthetic, in this case bipuvicaine, directly into to the surgi-cally repaired shoulder. The pump was implanted so that bipuvicaine was injected directly into the glenohumeral joint space in Mack's shoulder.[2] Mack ultimately experienced a complete degradation of the cartilage in her shoulder, a condition known as chondrolysis.[3] Dr. Diekmann prescribed the pain pump in the intra-articular joint space to approximately ten patients between 2000 and 2003. (Andrew Decl. Ex 23 (Docket No. 85) at 16, 21 (Diekmann Dep.).) Mack is the only patient of the ten that experienced cartilage damage. (*Id.* at 21.) Dr. Diekmann assumed that it was safe to use pain pumps in the intra-articular joint space because "at that time intra-articular injections of local anesthetic were a common way of treating short-term pain, and ... slow, continuous injection at that time was not seen to be any different than a frequent continuous injection." (*Id.* at 73.)

Mack contends that Stryker's pain pump, and in particular the continuous infusion of pain medication directly into the shoulder joint space, is the "probable cause" of her chondrolysis. (Andrew Decl. Ex. 25–B at 13 (Kurzweil Report II).) She also alleges that Stryker should have known that intra-articular placement of the pain pump could cause cartilage damage, and that Stryker nonetheless encouraged physicians to use its pump in ways that were likely to cause such damage.

---

1. Mack has named both Stryker Corporation and Stryker Sales Corporation as Defendants. The Court will refer to Defendants collectively as "Stryker."

2. The glenohumeral joint is the joint of the shoulder where the ball (humeral head) meets the socket (the glenoid). (Andrew Decl. Ex. 25–A at 3 (Kurzweil Report).) The glenohumeral joint space is also referred to more broadly as "joint space," "intra-articular space," "synovial space," and "synovial cavity." (Andrew Decl. Ex. 26–A at 4 (Trippel Report).)

3. More specifically, chondrolysis is "characterized as the complete loss of articular (or hyaline) cartilage. Articular cartilage covers bones where they contact other bones and acts as a lubricant, smoothing movement, reducing friction, and protecting bones from wear. Articular cartilage has difficulty repairing itself because it grows very slowly and has no blood supply." (Andrew Decl. Ex. 35 at 1.)

Mack and her husband brought a nine-count Second Amended Complaint, which alleges negligence, design defect, failure to warn, fraud, negligent misrepresentation, breach of express warranty, breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose, and loss of consortium. Mack subsequently agreed to voluntarily dismiss the fraud, misrepresentation, and warranty claims. The essence of Mack's claim is that Stryker is liable for failing to adequately explore whether it was safe to use the pain pump in the glenohumeral joint because Stryker knew that its product was being used in that manner. For purposes of its Motion for Summary Judgment, Stryker does not dispute that Mack's chondrolysis was caused by use of its pain pump.

## B. FDA Process

In 1998, Stryker's predecessor, McKinley Medical, sought clearance to market its pain pump for use in the "synovial cavity" under section 510(k) of the Federal Food, Drug, and Cosmetic Act. (*See* Andrew Decl. Ex. 33.) The FDA ultimately approved McKinley's device for general intraoperative use, but did not specifically give clearance for synovial cavity infusion because there was no "substantially equivalent" predicate device on the market for the same intended use. (Andrew Decl. Ex. 28 at 37 (Pence Report); Andrew Decl. Exs. 59–60.) In 1999, Stryker and McKinley entered into a supply agreement under which Stryker had the exclusive right to sell McKinley's pain pumps in the United States. (Pence Report at 34–35; 38.) In September 2000, Stryker purchased the intellectual and commercial rights to McKinley's pain pump products. (*Id.* at 35.) In 2001, Stryker filed a 510(k) application requesting clearance for use in the synovial cavity for the newest version of its pain pump. (*Id.* at 38.) The FDA again approved the device for general intraoper-

ative use, but did not specify use in the joint space. (Andrew Decl. Ex. 61 at 3.) Although the FDA letter does not address the reason for not approving this use, the parties agree that it was due to the lack of a predicate device. The parties also agree that at the time of Mack's surgery, the pain pump was FDA-cleared for the following use: "Intended to provide continuous infusion of a local anaesthetic directly into the intraoperative site for postoperative pain management." (Andrew Decl. Ex. 60 at 3.)

Although the parties disagree about the extent to which Stryker marketed its pain pump for use in the joint space, there is evidence in the record that Stryker actively marketed its product for this use to orthopedic surgeons and orthopedic surgery centers. (*See* Andrew Decl. Ex. 30 ¶ 10 (Paulos Decl.).) According to Dr. Lonnie Paulos, an orthopedic surgeon who served as a consultant to Stryker, "Stryker's marketing efforts included specific directions and instructions on how and where to place the pain pump catheter directly into the orthopedic joint space, such as the shoulder joint and the knee." (*Id.*)

## C. Relevant Scientific Knowledge

The record establishes that physicians commonly used pain pumps in the intra-articular joint space following orthopedic surgery beginning in the 1990s. It is undisputed that at the time of Mack's surgery there was no published literature specifically linking chondrolysis to intra-articular pain pump use. Plaintiff's causation expert, Dr. Stephen Trippel, testified that prior to June 2005, there were no articles drawing such a connection:

Q. And can you identify, Dr. Trippel, in one article where the author has concluded—let's talk about through 2005, June 23, 2005—where the author wrote

that some patient had experienced an outcome that affected their cartilage and they attributed it to any local anesthetic administered to the patient in any way or manner?

A. Well, ... [t]he answer to the question is no.

(Griffin Decl. Ex. 13 (Docket No. 76–2) at 445 (Trippel Dep.); *see also* Griffin Decl. Ex. 15 (Docket No. 76–2) at 132 (Kurzweil Dep.) (testifying that the first clinical report associating the use of continuous infusion of local anesthetic through a pain pump as a potential cause of chondrolysis was published in 2007).) Dr. Trippel testified that an article in 2004 accurately explained the then-current understanding of the causes of glenohumeral chondrolysis. (Trippel Dep. at 447–49 (referencing Petty, Damon H., et al., *Glenohumeral Chondrolysis After Shoulder Arthroscopy*, 32(2) AM. J. SPORTS MED. 509–15 (2004).)) Specifically, Dr. Trippel acknowledged that as of 2004, the medical community did not attribute the growing instances of glenohumeral chondrolysis to the intra-articular use of pain pumps:

Q. This—This is the conclusions by Dr. Petty in the paper, and I think you read part of it, and it goes as follows: "Glenohumeral chondrolysis is a rare and disturbing complication of routine shoulder arthroscopy. The disease pathophysiology is currently not understood." I assume that means how it evolves?

A. Correct.

Q. "Although thermal energy is suspected to play a role, it cannot explain known caused of glenohumeral chondrolysis in which no thermal energy was involved." That's accurate?

A. Yes.

(*Id.* at 447.) When asked whether Petty and his co-authors attributed chondrolysis to pain pump use, Dr. Trippel responded: "No, they didn't." (*Id.* at 448.) Dr. Trippel further acknowledged that the Petty

article accurately reported the state of scientific knowledge on the causes of glenohumeral chondrolysis in 2004. (*Id.* at 449.)

Stryker contends that it first became aware of cases of chondrolysis that developed after intra-articular pain pump use in August 2005, three years after Mack's surgery. Mack presents no evidence to the contrary and concedes that Stryker did not have actual knowledge that intra-articular use of its pain pump could cause cartilage damage at the time of Mack's surgery. Instead, Mack argues that at the time of her surgery there was sufficient published literature that, if properly studied, would have put Stryker on notice that this use of pain pumps could cause cartilage damage. Mack, principally through Dr. Trippel, relies on the following twelve articles in support of this contention.

- In 1933, Dr. J. Albert Key published an article reporting that continuous injection of weak acids, alkalies, distilled water, and salt solutions caused arthritis in rabbit knees. The severity of the arthritis increased with the number of injections administered over a period of weeks. The study did not test the impact of anesthetics. Key, Albert J., *The Production of Chronic Arthritis By the Injection of Weal Acids, Alkalies, Distilled Water, and Salt Solution into Joints*, 15 J. OF BONE & JOINT SURGERY 67–84 (1933). (*See* Andrew Decl. Ex. 26–A at 8–9 (Trippel Report).)

- In 1983, Brian Reagan published an article finding that saline solutions applied to bovine cartilage for one, two, five, and eight hours inhibited cartilage health. The study also showed that other solutions containing more nutrients were not as harmful as saline. The study did not test the impact of anesthetics on cartilage health. Reagan, Brian F., *Ir-*

*rigating Solutions for Arthroscopy, a Metabolic Study,* 65A J. OF BONE & JOINT SURGERY 629–31 (1983). (*See* Trippel Report at 8–9.)

- In 1985, Roberta Nole published an article documenting that the combination of saline and bupivacaine inhibited cartilage health after a two-hour period of exposure. The article also documents that the affected cells recovered after three days. Nole, Roberta, et al., *Bupivacaine and Saline Effects on Articular Cartilage,* 1(2) ARTHROSCOPY: THE J. OF ARTHROSCOPIC & RELATED SURGERY 123–27 (1985). (*See* Trippel Report at 9.) Nole concluded that "[b]ipuvacaine itself seems to be fairly well tolerated by articular cartilage, but the saline solution in which it is prepared is transiently inhibitory of the uptake of sulfates in articular cartilage." Nole, *supra,* at 126. The article also concluded that there was "[no] immediate need to stop the use of intra-articular bupivacaine." *Id.*

- In 1986, John Fulkerson published an article reviewing and summarizing existing studies relating to the impact of arthroscopic surgery on articular cartilage. Fulkerson relies on Nole's article for the proposition that bupivacaine and saline may cause transient damage to cartilage. Fulkerson, John P., et al., *Articular Cartilage Response to Arthroscopic Surgery: A Review of Current Knowledge,* 2(3) ARTHROSCOPY: THE J. OF ARTHROSCOPIC & RELATED SURGERY 184–89 (1986). (*See* Trippel Report at 9–10.)

- In 1992, Dr. J. Neidel published an article that documented a study involving injection of saline into rabbit joints over a four-week period. The study showed that repeated exposure of saline was harmful to the cartilage

and that the damage was partially reversed during the four-week period after the injections had stopped. The study cautioned against "extrapolation from data in rabbit studies to man or other primates." Neidel, J., et al., *Intra–Articular Injections and Articular Cartilage Metabolism: An Experimental Study in Rabbits,* 111 ARCHIVES OF ORTHOPAEDIC AND TRAUMA SURGERY 237–42 (1992). (*See* Trippel Report at 10.)

- In 1994, J.S. Jurvelin published a study involving the effect of irrigating solutions on articular cartilage. Anesthetics were not included among the solutions. The study indicated that prolonged exposure (up to 20 hours) to the irrigating solutions could inhibit or soften articular cartilage in cows and rats. Jurvelin, J.S., et al., *Effects of Different Irrigation Liquids and Times on Articular Cartilage: An Experimental, Biomechanical Study,* 10(6) ARTHROSCOPY 667–72 (1994). (*See* Trippel Report at 10–11.)

- In another study regarding the effects of prolonged irrigation on cartilage, also in 1994, Dr. S.K. Bulstra documented similar results. Bulstra, S.K., et al., The *Effect In Vitro of Irrigating Solutions on Intact Rat Articular Cartilage,* 76–B J. OF BONE & JOINT SURGERY 468–70 (1994). (*See* Trippel Report at 11.)

- In 1997, Kazuya Tamai published a report of orthopedic surgeons' experience with articular cartilage degradation following surgery. The article documents several cases of chondrolysis following shoulder exposure to gentian violet, which is a dye used to mark the skin in surgery preparation. Tamai, Kazuya, et al., *Chrondrolysis of the Shoulder*

*Following a "Color Test"—Assisted Rotator Cuff Repair—A Report of Two Cases,* 68 ACTA ORTHOPAEDICA SCANDINAVICA 401–02 (1997). (*See* Trippel Report at 12.)

- In 2001, International Orthopedics published a case report documenting two more cases of chondrolysis following gentian violet exposure. Shibata, Y., et al., *Chrondrolysis of the Glenohumeral Joint Following a Color Test Using Gentian Violet,* 25 INT'L ORTHOPEDICS 401–03 (2001). (*See* Trippel Report at 12.)

- In 1998, the Journal of Bone and Joint Surgery published a case report documenting chondrolysis in the knees of six patients who had an accidental irrigation of chemical antiseptic during surgery. Douw, C.M., et al., *Clinical and Pathological Changes in the Knee After Accidental Chlorhexidine Irrigation During Arthroscopy. Case Report and Review of the Literature,* 80–B J. OF BONE & JOINT SURGERY 437–40 (1998). (*See* Trippel Report at 12–13.)

- In 1999, the same journal reported three more patients with the same condition following chlorhexidine exposure. Van Huyssteen, A.L.; et al., *Chlorhexidine and Chondrolysis in the Knee,* 81–B J. OF BONE & JOINT SURGERY 995–96 (1999). (*See* Trippel Report at 13.)

- In July 2002, Arthroscopy published an article documenting the effect saline, morphine, and bupivacaine have on human cartilage. Jaureguito, John W., et al., *The Effects of Morphine on Human Articular Cartilage of the Knee: An In Vitro Study,* 18 ARTHROSCOPY 631–36 (2002). (*See* Trippel Report at 11–12.) Although the article found some negative effect on cartilage from the combination of morphine with bupivacaine, the authors noted that "a significant limitation of this study was that the cartilage selected [for the in vitro study] was from older patients with advanced osteoarthritis," and "we may reasonably believe the articular cartilage from middle-aged and younger patients may behave differently from that of older patients." Jaureguito, *supra,* at 635. The study also concluded that tested combinations of bupivacaine and morphine did not have a "deleterious effect" on human articular cartilage. *Id.*

Stryker admits that it did not conduct a literature search or safety testing of pain pump use in the intra-articular joint space prior to Mack's surgery and therefore did not review any of the above articles before designing and marketing its pain pump for intra-articular use. Stryker denies that any of the above articles were sufficient to put it on notice that its product was unsafe.[4]

## D. Other Similar Cases

This case is one of many similar cases pending in this and other districts around the country. In addition to Stryker, at least two other pain pump manufacturers—Breg, Inc. and I–Flow Corp.—have been sued on the same grounds alleged here. The outcomes of those cases have varied. For example, numerous cases have survived summary judgment and

---

4. Stryker also points to several pre-surgery articles that suggested that intra-articular use of pain pumps was safe and effective. *See, e.g.,* Savoie, et al., *The Pain Control Infusion Pump for Postoperative Pain Control in Shoulder Surgery,* 16 ARTHROSCOPY 339 (2000); Barber, et al., *The Effectiveness of an Anesthetic Continuous–Infusion Device on Postoperative Pain Control,* 18 ARTHROSCOPY 76 (2002).

some of those cases have gone to trial. Many of the cases in which the court denied summary judgment involved surgeries that were performed at or near the time the medical community was discovering the possible connection between chondrolysis and pain pump use. *See, e.g., Staub v. Breg, Inc.,* No. CV 10–02038–PHX–FJM, 2012 WL 1078335 (D.Ariz. Mar. 30, 2012) (April 2005 surgery); *Monroe v. Zimmer U.S., Inc.,* 766 F.Supp.2d 1012 (E.D.Cal.2011) (May 2007 surgery); *Hamilton v. Breg, Inc.,* No. 2:09–CV–146, 2011 WL 780541 (S.D.Ohio Jan. 20, 2011) (February 2006 surgery); *Suhn v. Breg, Inc.,* No. CIV 08–4190–KES, 2010 WL 5301043 (D.S.D. Dec. 20, 2010) (December 2005 surgery); *Schoenborn v. Stryker Corp.,* 801 F.Supp.2d 1098 (D.Or.2011) (November 2004 surgery); *but see Hackett v. Breg, Inc.,* No. 10CV1437, 2011 WL 4550186 (D.Colo. Oct. 3, 2011) (April 2002 surgery); *Creech v. Stryker Corp.,* No. 2:07CV22 DAK, 2012 WL 33360 (D.Utah Jan. 6, 2012) (surgeries between February 2003 and July 2004).

Other cases have been dismissed at the summary judgment stage based on the court's finding that the risks of cartilage damage were not knowable at the time of the plaintiff's surgery. *See Rodriguez v. Stryker Corp.,* No. 2:08–0124, 2011 WL 31462 (M.D.Tenn. Jan. 5, 2011) (November 2004 surgery), *aff'd,* 680 F.3d 568 (6th Cir.2012), *reh'g and reh'g en banc denied,* No. 11–5335 (6th Cir. July 30, 2012); *Phillippi v. Stryker Corp.,* No. 2:08–CV–2445–JAM–KJN, 2010 WL 2650596 (E.D.Cal. July 1, 2010) (July 2005 surgery), *aff'd,* 471 Fed.Appx. 663 (9th Cir.2012); *Meharg v. I–Flow Corp.,* No. 1:08–cv184–WTL–TAB, 2010 WL 711317 (S.D.Ind. Mar. 1, 2010) (February 2006 surgery); *Pavelko v. Breg, Inc.,* No. 09–cv–01461–PAB–KMT, 2011 WL 782664 (D.Colo. Feb. 28, 2011) (June 2003 surgery); *Krumpelbeck v. Breg, Inc.,* 759 F.Supp.2d 958 (S.D.Ohio 2010) (March 2005 surgery), *rev'd in part on state statutory grounds,* 491 Fed.Appx. 713, No. 11–3726, 2012 WL 3241587 (6th Cir. Aug. 10, 2012). This is the first such case in this District to reach summary judgment on the issues presented here.[5]

## DISCUSSION

### A. Standard

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir.1996). However, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* at 323, 106 S.Ct. 2548; *Enter. Bank,* 92 F.3d at 747. A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**5.** In *Prettyman v. Stryker Corp.,* No. 09–2794, 2012 WL 2568645 (D.Minn. July 3, 2012), Judge Tunheim denied Stryker's motion for summary judgment, which was based solely on whether Stryker manufactured the pain pump used in the plaintiff's surgery.

## B. Strict Liability/Negligence

 Under Minnesota law, a plaintiff can recover in a products-liability action by showing that: (1) the product at issue was "in a defective condition, unreasonably dangerous for its intended use; (2) such defect existed when the product left the defendant's control; and (3) the defect was the proximate cause of the injury sustained." *Lee v. Crookston, Coca–Cola Bottling Co.,* 290 Minn. 321, 188 N.W.2d 426, 432 (1971); *Schafer v. JLC Food Sys., Inc.,* 695 N.W.2d 570, 576 (Minn.2005). The distinction between theories of strict liability and negligence is typically insignificant in a products-liability action. As explained in Lee, under the theory of strict liability, "[w]hile in conventional tort terms no proof of negligence is necessary, in many cases proof of a defect may simply be a substitute word for negligence." 188 N.W.2d at 432. The Minnesota Supreme Court has held that with respect to failure-to-warn and design-defect claims, the theories of negligence and strict liability are effectively merged into a single theory of products liability. *Bilotta v. Kelley Co.,* 346 N.W.2d 616, 623 (Minn.1984); *see also Piotrowski v. Southworth Prods. Corp.,* 15 F.3d 748, 751 (8th Cir.1994) (recognizing that "strict liability and negligence in design defect and failure to warn actions merge").

The parties agree that the standard articulated several decades ago in *O'Hare v. Merck & Co.,* 381 F.2d 286 (8th Cir.1967), provides the framework for the Court's analysis. The *O'Hare* court recognized that a medical device manufacturer "is not an insurer with respect to the products with which he deals." *Id.* at 291 (citations omitted). Rather, the manufacturer "has the duty to exercise ordinary and reasonable care not to expose the potential consumer to an unreasonable risk of harm from the use of its products." *Id.*

O'Hare explains that a manufacturer's liability is dependent on the foreseeability of the harm:

[A] manufacturer's duty to additionally test and investigate the propensities of its product is dependent upon the *foreseeable risk of harm* to potential users in light of current scientific or medical knowledge and discoveries.... Liability will not attend those injurious consequences resulting from the use of a product, the harmful effects of which 'no developed human skill or foresight can afford knowledge.'

The manufacturer's duty to warn users of the potential danger inherent in its product is commensurate with its actual knowledge of the risk involved to those users or the knowledge constructively imparted to it by available scientific or other medical data.

*Id.* (emphasis added) (internal citations omitted).

 Thus, the core question before the Court is whether based on the information available to Stryker at the time of Mack's surgery, there was a "foreseeable risk of harm" to Mack's shoulder cartilage through intra-articular use of Stryker's pain pump.[6] "Foreseeability of injury is a threshold issue related to duty that is ordinarily 'properly decided by the court prior

---

**6.** The Court agrees with Mack that Stryker need not have been on notice of the specific risk of chondrolysis, but the zone of foreseeable risk is not without boundaries. Stryker is not charged with constructive knowledge of any potential harm that could befall its users. Indeed, Mack's theory is that scientific literature should have put Stryker on notice that the intra-articular use of its pain pump could cause harm to cartilage. The Court adopts Mack's view of the scope of the foreseeable harm and make its determination based on whether Stryker had constructive knowledge that its pain pump could cause cartilage damage.

to submitting the case to the jury.'" *Domagala v. Rolland,* 805 N.W.2d 14, 27 (Minn.2011) (quoting *Alholm v. Wilt,* 394 N.W.2d 488, 491 n. 5 (Minn.1986)). "In determining whether a danger is foreseeable, courts looks at whether the specific danger was objectively reasonable to expect, not simply whether it was within the realm of any conceivable possibility." *Whiteford v. Yamaha Motor Corp.,* 582 N.W.2d 916, 918 (Minn.1998).

Mack contends that Stryker is liable for failing to test its product to ensure that its known use in the intra-articular joint did not pose a risk of harm and for failing to warn doctors that injury could result from such use.[7] Mack concedes that there is no evidence that Stryker actually knew at the time of her surgery in 2002 that use of its device to administer anesthetic to the intra-articular joint space could cause harm. (*See* Hr'g Tr. at 13 ("We are not claiming that the defendant, Stryker, failed to warn prior to, or at the time of, Carol Mack's surgery in 2002 of a link between infusion of anesthetic in this pain pump and chondrolysis. We are not claiming that because, indeed, no one knew that at this time.")) Rather, Mack argues that two key facts rendered that harm reasonably foreseeable at the time of Mack's surgery: (1) the FDA's decision to deny clearance for the pain pump's use in the joint space, and (2) the scientific literature described above suggesting that prolonged exposure to various solutions could cause cartilage damage.

### 1. FDA Denial

This Court has already concluded in this case that the FDA's decision to deny clearance for the use of the pain pump in the joint space was due to the lack of a predicate device and "not because the device

had been proven unsafe in tests or studies." (Docket No. 61 at 9.) This finding is consistent with other cases commenting on the import of the 510(k) process. *See Medtronic, Inc. v. Lohr,* 518 U.S. 470, 493, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) ("The 510(k) process is focused on equivalence, not safety."); *Riegel v. Medtronic, Inc.,* 552 U.S. 312, 322, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008) (reiterating same); *Rodriguez v. Stryker Corp.,* 680 F.3d 568, 574 (6th Cir.2012) (rejecting the argument that the FDA denial triggered Stryker's duty to test and/or warn because "[t]he FDA's action means only that no other device on the market carried that indication for use. It does not mean that the pump was (or might potentially be) dangerous to use in the joint space"); *Forslund v. Stryker Corp.,* No. 09–2134, 2010 WL 3905854, at *4 n. 5 (D.Minn. Sept. 30, 2010) (Tunheim, J.) (FDA denial "is not probative of whether Stryker knew or should have known of the risks relating to the use of the pain pump in the shoulder joint space and therefore that Stryker had a duty to warn about that potential use."); *Healey v. I–Flow, LLC,* 853 F.Supp.2d 868, 877–79 (D.Minn.2012) (Keyes, M.J.) (FDA denial did not establish that the FDA determined that intra-articular use of the pain pump was unsafe).

Mack concedes that the FDA denial does not form the basis of Stryker's liability under Minnesota law: "I'm not arguing that they were negligent or that our cause of action is established based on whether or not they got FDA approval. I'm not arguing that." (Hrg. Tr. at 15.) Further, Mack does not present any evidence (or even argue) that Stryker understood that the FDA denial was due to safety concerns. Nor does Mack directly argue that Stryker violated any FDA reg-

---

7. There is no independent duty to test under Minnesota law, but it is generally subsumed within the duty to adequately warn. *Kociem-*

*ba v. G.D. Searle & Co.,* 707 F.Supp. 1517, 1528 (D.Minn.1989).

ulation in the context of this case. Rather, Mack argues that the FDA denial was a "hint" to Stryker that it should have conducted testing determine whether the pump's use in the joint space was safe. (*Id.* at 16.)

It would be illogical to conclude that the FDA denial, which was not based on safety concern, and did not raise a safety concern within Stryker, triggered to duty to undertake safety testing or to warn of safety concerns. Under these circumstances, the FDA denial did not raise an objectively reasonable safety concern and therefore did not trigger a duty to warn or to conduct safety testing.

### 2. Scientific Literature

■ Mack also contends that the scientific literature available at the time of her surgery was sufficient to trigger Stryker's duty to test and/or warn because the reported studies suggest that cartilage damage could result from using a pain pump in the joint space. Mack specifically points to the twelve articles discussed above in support of this proposition. The Court is not persuaded. None of the twelve articles draws a connection between intra-articular pain pump use and chondrolysis. Nor do any of the articles clearly suggest that prolonged exposure to bupivacaine can cause cartilage damage. Moreover, many of the articles are of dubious relevance. For example, five of the articles study the effects of irrigating solutions (primarily saline) on joints. *See* Key, *supra*; Reagan, *supra*; Jurvelin, *supra*; Bulstra, *supra*, Neidel, *supra*. Two other articles catalog instances of chondrolysis following exposure to dye, specifically gentian violet. *See* Tamai, *supra*; Shibata, *supra*. Another two articles study the

effect of antiseptic on cartilage. *See* Douw, *supra*; Van Huyssteen, *supra*.

The two remaining studies [8] are probative, but not sufficient to alert the medical community of a connection between pain pumps and chondrolysis. The study reported by Nole in 1985, which is arguably the most on point, concluded that "[b]ipuvacaine itself seems to be fairly well tolerated by articular cartilage, but the saline solution in which it is prepared is transiently inhibitory of the uptake of sulfates in articular cartilage." Nole, *supra*, at 126. Nole also concluded that there was "[no] immediate need to stop the use of intraarticular bupivacaine." *Id.* Nole further reported that affected cells recovered after three days, thereby suggesting that any impact was fleeting and reversible. *Id.* Likewise, the Jaureguito study, which documented the effect of saline, morphine, and bupivacaine on human cartilage, concluded that tested combinations of bupivacaine and morphine did not have a "deleterious effect" on human articular cartilage.[9] Jaureguito, *supra*, at 635.

As the Sixth Circuit concluded in *Rodriguez*, none of the articles "shows that medical experts understood in [2002] that infusing a joint with bupivacaine for two days could cause irreversible cartilage damage. Stryker had no duty to understand what the relevant medical literature did not." *Rodriguez*, 680 F.3d at 572. The *Rodriguez* court highlighted a particular passage from the district court's opinion reasoning that the scientific knowledge in 2004 was simply too undeveloped and attenuated to establish Stryker's liability:

> While the pre–2004 medical articles raise the general notion that health of (usually animal) cartilage could be weakened by prolonged exposure to certain

---

8. The Fulkerson article reviewed other studies, such as the Nole study, but did not report independent findings. *See* Fulkerson, *supra*.

9. Regardless of its content, the Court questions whether this article is relevant in this case because it was published in July 2002, just one month prior to Mack's surgery.

"foreign elements," it is a bridge way too far to say that Stryker—in the context in which infusion pumps were broadly used and medically accepted without reservation—should have, prior to marketing the pain pump, culled through seven decades of literature, found the sporadic articles raising this concern, ignored all the authority/evidence to the contrary, and then independently concluded that its pain pump could cause chondrolysis, particularly where no one in the medical community connected the destruction of cartilage to the use of pain pumps until after the plaintiff's surgery.

*Id.* at 573 (quoting *Rodriguez v. Stryker Corp.*, No. 2:08–0124, 2011 WL 31462, at *7 (M.D.Tenn. Jan. 5, 2011)). The Court concurs with this reasoning and finds that in this case it is "a bridge way too far" to hold Stryker liable based on the scientific literature available in 2002.[10]

Dr. Trippel's report, which concludes that the twelve articles exposed the risk of cartilage damage through intra-articular pain pump use, does not shorten the bridge. "[S]ummary judgment may be appropriate if an expert opinion is fundamentally unsupported and therefore of no assistance to the trier of fact." *Eckelkamp v. Beste*, 315 F.3d 863, 868 (8th Cir.2002); *see also Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1061–62 (8th Cir.2005) (affirming grant of summary judgment because even with the expert's testimony, the plaintiff failed to present evidence from which a reasonable jury could find the defendant liable). The Court concludes that such is the case here. The twelve articles plainly do not support

the conclusion that in 2002 Stryker should have known that its pain pump could case cartilage damage. Dr. Trippel acknowledged that the medical community did not draw the connection between pain pumps and chondrolysis or any injury like that suffered by Mack until 2005. (Trippel Dep. at 445.) Stryker should not be charged with constructive knowledge of something that no one else in the medical community knew.

Based on the evidence presented, the Court is not satisfied that a reasonable jury could conclude that Stryker should have known before Mack's surgery in 2002 that the pain pump created a foreseeable risk of the harm caused. The Court is also troubled by the hindsight and speculation necessary to find in favor of Mack. Mack's position hinges on the premise that had Stryker performed testing, it would have determined that intra-articular use of its pain pump could cause cartilage damage and, more specifically, chondrolysis. In other words, Stryker should have been the first one in the medical community to perform the right tests, connect all of the dots, and ultimately determine that intra-articular use of the pain pump could be harmful to cartilage. The law does not obligate Stryker to be a pioneer, particularly when existing literature did not objectively forewarn of injury. *See O'Hare*, 381 F.2d at 291 (constructive knowledge is limited to the "available scientific or other medical data"). There is no dispute that there was no data linking the intra-articular use of pain pumps to chondrolysis or, to be candid, any injury in the realm Mack experienced, until 2005, three years after Mack's surgery.[11] Mack's expert, Dr. Pe-

---

10. Stryker's admitted failure to review existing literature prior to Mack's surgery is ultimately irrelevant because the Court finds that the articles relied on by Mack would not have given Stryker constructive notice of the poten-

tial connection between pain pumps and chondrolysis.

11. The parties disagree as to whether there is presently a clear consensus on the causal

ter Kurzweil, explained that it has taken years to understand the genesis of glenohumeral chondrolysis because "[r]arely does something always cause a specific reaction every single time." (Andrew Decl. Ex. 25–A (Kurzweil Report) at 15.) Dr. Kurzweil used the causal connection between tobacco use and cancer as an example of why it can take years to conclusively determine something that in hindsight seems so obvious:

> [I]t took years to link cigarette smoking and lung cancer for many similar reasons: (1) lung cancer does not happen instantly—it takes years; (2) lung cancer is more likely to develop after a higher concentration and prolonged exposure: those who smoke more cigarettes everyday for a longer period of time are more likely to develop lung cancer; (3) not everyone who smokes cigarettes develops lung cancer; and finally, (4) there are other causes of lung cancer than smoking cigarettes—just like there appear to be several causes of [glenohumeral chondrolysis].

(*Id.*)

It would be nothing short of rank speculation to suggest that any testing Stryker may have undertaken prior to 2002 would necessarily have revealed the causal connection that is still arguably unsettled today. *See Burley v. Kytec Innovative Sports Equip., Inc.*, 737 N.W.2d 397, 411 (S.D.2007) (stating that imposing liability for failure to test "where the causal link to the known harm to [Burley] is the unknown outcome of testing that was not done, would be beyond the pale of any . . . tort doctrine we can identify") (citations omitted). The Court will not subject Stryker to liability based on speculation and hindsight.

connection between chondrolysis and pain

## CONCLUSION

There are no genuine issues of material fact precluding summary judgment on Mack's claims against Stryker. Accordingly, **IT IS HEREBY ORDERED that:**

1. Defendants' Motion for Summary Judgment (Docket No. 73) is **GRANTED;**

2. Defendants' Motion to Exclude the Testimony of Dr. Stephen Trippel Re "Safety Testing" and State of the Scientific Literature for Notice (Docket No. 68) is **DENIED as moot;** and

3. Plaintiffs' Motion to Limit or Exclude Defendants' Experts as Cumulative (Docket No. 62) is **DENIED as moot.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**